Joe Nathan **COLEMAN**, Willie Lee Hazelwood, Aline Hunter, and William H. Scott, Plaintiffs,

v.

**C. B. AYCOCK, et al., Defendants.**

**No. GC 6538.**

United States District Court
N. D. Mississippi,
Greenville Division.

Sept. 22, 1969.

See also, D.C., 39 F.R.D. 373.

---

Reuben V. Anderson and Fred Banks, of Anderson, Banks & Nichols, Jackson, Miss., Jonathan Shapiro, New York City, for plaintiffs.

Irby Turner, Jr., James T. Bridges, Jr., Belzoni, Miss., Will S. Wells, Asst. Atty. Gen. of Mississippi, Jackson, Miss., for defendants.

## MEMORANDUM OPINION

ORMA R. SMITH, District Judge.

Plaintiffs, Joe Nathan Coleman, Willie Lee Hazelwood, Aline Hunter and William H. Scott, Negro resident citizens of the City of Belzoni, Humphreys County, Mississippi, brought this class action on behalf of themselves and others similarly situated, against certain elected and appointed officers of said county and city.

Humphreys County is situated in the Mississippi Delta. The population of the county is 19,093, of which 13,300, or approximately 69% is black.[1] Belzoni is the county seat of the county, and has a population of 4142 of which 2528, or approximately 61% is black.[2] Belzoni was chartered in 1895.

Plaintiffs, at least two of whom (Coleman and Hunter) were residents of Belzoni at the time the action was filed, contend that defendants have been, are and will be enforcing racial discrimination and segregation in the use of public facilities under color of law or custom and usage. The facilities, the use of which is the subject of this action include, inter alia, the courthouse, jail, hospital, swimming pools, parks, and streets. Plaintiffs complain also of discrimination in the rendition of certain public services by the municipality, such as sewerage, garbage disposal, police protection, etc.

Jurisdiction is invoked under 28 U.S.C. §§ 1331, 1343, 1355, 1357, 2072, 2201, 2202, 2281, and 2294; also 42 U.S.C. § 1981, 1983 and the Civil Rights Act of 1964, 78 Stat. 241, particularly Title II and III thereof.

Plaintiffs seek to enjoin defendants from practicing, under color of law, racial discrimination in the operation of public facilities and in the furnishing of municipal and other services to citizens of the community. Plaintiffs invoke the Due Process and Equal Protection clause of the Fourteenth Amendment of the Constitution of the United States, the Fifth Amendment and Article I, Section 8 of the Constitution.

After a trial to the Court, the submission of briefs, and argument of the coun-

1. Mississippi Official Statistical Register, 1964–1968, page 322.

2. United States Census of Population 1960, Mississippi General Population Characteristics, United States Department of Commerce, Bureau of Census, Table 22, Pp. 26–43.

sel, the case is before the Court for its decision.

The controlling principles of law are well settled. The Fourteenth Amendment requires that government at all levels treat all citizens alike, regardless of race, color, or creed. Slaughter-House Cases (U.S.), 16 Wall. 36, 67–72, 21 L.Ed. 394, 405–407 (1873); Strauder v. West Virginia, 100 U.S. 303, 307–308, 25 L.Ed. 664 (1880). This command bars segregation in public facilities, Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873 (1954) [3]; and racial equality in the provision of governmental services. Katzenbach v. Morgan, 384 U.S. 641, 652–653, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).

The charge of the complaint is broad and encompasses practically all public facilities operated by the county and city and many of the services rendered by the municipality. For the sake of clarity, the Court will discuss these facilities and services by appropriate groups.

At the outset, however, the Court must consider several questions raised by defendants as to the parties to the suit.

## PARTIES

PLAINTIFFS. At the trial of the case, only two plaintiffs testified. One of these was Joe Nathan Coleman. At the time the suit was filed he lived in the City of Belzoni. When the case was tried he resided in the county, but outside the city. Coleman did not own taxable property in the City of Belzoni. He was a tenant rather than a home owner. The argument is made that as Coleman does not own property situated in Belzoni upon which he pays taxes, and did not complain in his testimony of inadequate or discriminatory municipal services or facilities, he is not entitled to any relief against the City of Belzoni; that since he is not entitled to relief, neither is the class which he claims to represent. The same argument is made as to Aline Hunter, the other plaintiff who testified in the case. Mrs. Hunter is not a property owner in the city, and her rented home is on one of the paved streets in the Negro section of town.

The evidence does not show the residence of the other plaintiffs. Defendant contends, therefore, that as plaintiffs, Coleman and Hunter, are not entitled to any relief against the City of Belzoni, and the residence of the other plaintiffs is not shown by the evidence, plaintiffs have failed to sustain their standing in the case as to the City of Belzoni.

All plaintiffs are members of the black race—plaintiff Coleman resided in the City of Belzoni when the suit was filed, and continues to reside in the County of Humphreys. Plaintiff Hunter resided in

3. In Brown, often referred to in school cases as Brown I, in discussing the rights in our society of members of the colored race, the court said:

"In the first cases in this Court construing the Fourteenth Amendment, decided shortly after its adoption, the Court interpreted it as proscribing all state-imposed discriminations against the Negro race.[5]

"5. Slaughter-House Cases, 16 Wall. 36, 67–72 [21 L.Ed. 394] (1873); Strauder v. West Virginia, 100 U.S. 303, 307–308 [25 L.Ed. 664] (1880): 'It ordains that no State shall deprive any person of life, liberty, or property, without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. What is this but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race,—the right to exemption from unfriendly legislation against them distinctively as colored,—exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race.'"

the City of Belzoni when the suit was filed and was living there when the case was tried. The action is bottomed on the charge that defendants, including those representing the City of Belzoni, acting under color of law, have practiced and continue to practice discrimination in providing public facilities and municipal services, on the basis of race. It is clear that plaintiffs have standing to prosecute the action. They have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the Court so largely depends for illumination of difficult constitutional questions". Baker v. Carr, 1962, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663.[4] That plaintiffs are not property owners and, therefore, not taxpayers is not decisive of their standing.[5]

■ In the case sub judice, being members of the Negro race, residents of community, comprising the county and city, they have standing to challenge the inferiority of municipal services provided by the city officials to the black community of the city.

■ The fact that Coleman moved outside the city into the county area, after the suit was filed, does not defeat his right nor the right of members of the class represented by him to prosecute the suit. Rackley v. Board of Trustees of Orangeburg Regional Hospital, E.D.S.C. 1965, 238 F.Supp. 512, 515; McSwain v. Board of Education, E.D.Tenn. 1956, 138 F.Supp. 570.

It is clear to the Court that plaintiffs Coleman and Hunter have standing to prosecute this action against the City of Belzoni, in their own behalf and for the benefit of other black citizens of the community, similarly situated.

DEFENDANTS. The defendants are the Mayor and members of the Board of Aldermen of the City of Belzoni, and its Engineer, Clerk and Chief of Police. The Mayor, Clerk and Chief of Police held their respective positions when the case sub judice was filed, and no question is presented as to their status in the case. The complaint named W. J. Lea, S. L. Reed, W. L. Solomon, Jr., O. R. Bridges and T. N. Turner, defendants in their official capacities, as members of the Board of Aldermen, and summons for them

---

4. In Baker the Court said:
 "A federal court cannot 'pronounce any statute, either of a state or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies.' Liverpool [N. Y. & P.], Steamship Co. v. Commissioners of Emigration, 113 U.S. 33, 39 [5 S.Ct. 352, 28 L.Ed. 899]. Have the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions? This is the gist of the question of standing. It is, of course, a question of federal law."

5. The case of Arrington v. City of Fairfield, 414 F.2d 687, 5 Cir. August 7, 1969, involved the standing of Negro tenants in an area of the city which was being acquired through the efforts of the city and certain private firms for use in the construction of a motel near an interstate highway. The court, in holding that the tenants had standing to bring the action, said:
 "In order to have standing to assert that a state has denied plaintiff his constitutional rights, a plaintiff is required to show 'a personal stake in the outcome of the controversy'. Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1961). He must be adversely affected to a judicially cognizable degree by the government action he seeks to challenge. See, generally, Davis, Standing: Taxpayers and Others, 35 U.Chi.L.Rev. 601 (1968). Here plaintiffs' stake in the outcome of the case is immediate and personal and they stand to suffer economic injury if they lose. The right which they allege has been violated; namely, the right not to be subjected to racial discrimination by state action, is one which falls within a constitutionally protected area. Cf. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

was issued as members of the Board. The summons was served on T. N. Turner, Jr., instead of T. N. Turner, the former being the Board member, The summons was served on W. J. Lea and S. L. Reed. W. L. Solomon, Jr. and O. R. Bridges were not in fact members of the Board, and instead of serving them with process the Marshal served the summons on the members of the Board who succeeded them. These new members are Lamar Griffin and Jack Peden. The Engineer named in the summons had been succeeded in office, and the Engineer active at the time was served by the Marshal rather than the one named in the summons. Defendants contend that the said active members of the Board and the active Engineer of the city are not properly before the Court, as they were not named in the complaint or summons as party defendants. T. N. Turner, Jr., member of the Board, appeared and defended the action, and thus the question as to service upon him is solved.

It is admitted that Lamar Griffin and Jack Peden were members of the Board of Aldermen, and James Barron was the City Engineer when they were served with the summons. The complaint sued the members of the Board of Aldermen and City Engineer in their official capacities as officials of the city. Rule 25(d) of the Rules of Civil Procedure, provides for the substitution of parties. The rule provides:

"(2) When a public officer sues or is sued in his official capacity, he may be described as a party by his official title rather than by name; but the court may require his name to be added."

It is apparent in the case sub judice that the real defendants are the officials of the city, rather than the individuals who hold the offices. Instead of serving ex-officials with the summons, the Marshal served the individuals holding the respective offices.

While the summons named the individuals said to be incumbent officials at the time, it is clear that the summons was directed to the party or parties actually holding the office. In such a case, the name of the official can and should be treated as surplusage. The purpose and intent of the rule has been satisfied.

■ The Court is of the opinion and so finds that it is proper to substitute Jack Peden and Lamar Griffin, members of the Board, for W. L. Solomon, Jr. and O. R. Bridges, former members, and James Barron, City Engineer, for E. L. Young, as parties defendant, by their respective official titles.[6] The other three members of the board, being a majority thereof, and other city officials appeared and defended the action.

There can be no prejudice by permitting the substitution to be made at this time.

When the suit was filed Mrs. J. Alfred Able was a member of the Board of Supervisors of the county. Mrs. Able's term expired on the first Monday of January 1968. She was succeeded by James L. Long. B. S. Reed, a mem-

---

6. This holding of the court is supported by the authorities.

See generally 2 Barron and Holtzoff, Federal Practice and Procedure, (Wright ed. 1961), §§ 625 and 626: Lankford v. Gelston, 4 Cir. 1966, 364 F.2d 197. In this case the court in a footnote said:

"Though not stressed, the fact was mentioned in oral argument that since the preparation of the briefs the defendant named in the District Court proceeding has retired from office and has been succeeded by General George M. Gelston, as Interim Police Commissioner, whose successor is to be appointed in the near future. This presents no difficulty. Our concern is not with the person who happens to hold the office at the particular time, but with the office. The named defendant is only a nominal party, and the real aim of the proceeding is not to reach the Commissioner individually but to forbid an evil practice that has long and notoriously persisted in a Police Department."

Elliott v. Federal Home Loan Bank Board, U.S.D.C.S.D.California 1964, 233 F.Supp. 578.

ber of the Board at the time the suit was filed, died and was succeeded by Ronnie Buchanan. John D. "Jack" Purvis, who was served with process herein as Sheriff of the county, was succeeded in office in January 1968, by J. L. Hufstickler. The plaintiffs did not take any action prior to trial to substitute these parties as defendants in the suit, taking the position that substitution was automatic under the provisions of Rule 25(d)(1) of the Federal Rules of Civil Procedure which provides:

"When a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and his successor is automatically substituted as a party."

The plain terms of the rule sustain the position of plaintiffs. The case law is in accord. Lankford v. Gelston, supra; Four Star Publications, Inc. v. Erbe, 8 Cir. 1962, 304 F.2d 872. Professor Charles Alan Wright, in discussing the amended Rule 25, says at 2 Barron and Holtzoff, Federal Practice & Procedure, § 626, (Wright ed. 1961) page 449:

"In summary, the rule should be held applicable and to permit automatic substitution both of federal and state officers, but the burden of showing whether there is a substantial need for continuing the action, if challenged by an assertion that the suit is moot, will be on the plaintiff if a state officer is involved, though on the officer where he is connected with the federal government."

Thus, by applying the rule to the case sub judice, James L. Long has been automatically substituted for Mrs. J. Alfred Able, Ronnie Buchanan for B. S. Reed, and J. L. Hufstickler for J. D. "Jack" Purvis. An order of substitution is not required and can be made at any time.[7]

## COUNTY FACILITIES

COURTHOUSE AND JAIL. Mississippi Statutes require that boards of supervisors (1) shall cause to be erected and kept in good repair, in their respective counties, and in each judicial district thereof, a good and convenient courthouse and a jail;[8] (2) may employ a janitor for the courthouse;[9] and (3) shall examine into the state and condition of the jail at least every three months.[10]

Mississippi Law provides that the Sheriff shall have charge of the courthouse and jail of the county and the premises belonging thereto, and of the prisoners in the jail.[11] In counties such as Humphreys, where the jail is not jointly owned with a municipality, the sheriff is the jailer of his county.[12] Prior to 1968, the Sheriff was required by statute to segregate prisoners according to race and sex. Chapter 552, Mississippi Laws, 1968, amended the applicable section of the Code (§ 4259) and eliminated the requirement that prisoners in the jail be segregated by race. This chapter became effective April 29, 1968.

The evidence in the case sub judice shows, without conflict, that at the time the suit was filed the Sheriff of the county, J. D. "Jack" Purvis, segregated the prisoners in his custody by race.

---

7. The notes of the Advisory Committee on Rules, following the 1961 amendment to Rule 25(d)(1) provide:

"Under the amendment, the successor is automatically substituted as a party without an application or showing of need to continue the action. An order of substitution is not required, but may be entered at any time if a party desires or the court thinks fit."

8. Mississippi Code 1942, Annotated, Recompiled §§ 2890, 2894.

9. *Id.* § 2906.

10. *Id.* § 2913.

11. *Id.* § 4256.

12. *Id.* § 4259.

This practice continued and existed when he left office in January 1968. Mr. Purvis' successor, J. L. Hufstickler, continued the practice until the eve of the trial in September 1968. At the trial Mr. Hufstickler contended that he had not been informed of the change in the law made by the Mississippi Legislature by the Act of April 29, 1968, until he conferred with the Assistant Attorney General assigned to the trial of the case immediately before the trial; that he discontinued the segregation of prisoners by race in the jail, and that he would not practice segregation by race in the jail at any time in the future.

Defendant Hufstickler contends that the case sub judice is moot, insofar as it relates to segregation practices at the jail. In support of this contention he cites the case of Four Star Publications, Inc. v. Erbe, supra, in which the court said:

"Professor Charles Alan Wright, in discussing the amended Rule 25, says, at 2 Barron & Holtzoff, Federal Practice & Procedure, § 626 (Wright Ed. 1961), pages 448–449:

'* * * Presumably where the successor in fact does disavow the policy of his predecessor, he can make such a showing and if this does make the suit moot, tested by usual standards, it should be dismissed as such. The burden will be on the officer to show that the suit is moot.'" 304 F.2d, 874, 875.

The trouble with Mr. Hufstickler's position is that he continued the practice of his predecessor until the very eve of the trial. Mr. Hufstickler had read in the newspaper of the change in the law, but did not consider it his duty to make the change in the practice until he was officially notified. The Assistant Attorney General in charge of the defense of the suit informed him as to his duties in this regard in conferences held before the trial. He then proposed to discontinue the practice.

The reports abound with cases which establish the rule that the Court's power to grant injunctive relief survives the discontinuance of the illegal conduct. Bailey v. Patterson, 5 Cir. 1963, 323 F.2d 201, cert. denied, City of Jackson v. Bailey, 376 U.S. 910, 84 S.Ct. 666, 11 L.Ed. 2d 609 (1964); Anderson v. City of Albany, 5 Cir. 1963, 321 F.2d 649; United States v. W. T. Grant Co., 1953, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303; United States v. Oregon State Medical Society, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978. In the case sub judice, the Sheriff continued the practice of segregation in the jail after such practice was no longer required under the Mississippi Statutes until the eve of the trial.

The Court finds that the offer of Mr. Hufstickler to abide by the law and afford plaintiffs and members of the class represented by them their constitutional protected rights, comes too late to avoid the impact of injunctive relief.

There is no question but that protection from racial discrimination by governmental authorities in the use of prisons and jails is provided by the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. Washington v. Lee, 263 F.Supp. 327, U.S.D.C., M.D.Ala., 1966, affirmed by United States Supreme Court in Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968).

COURTHOUSE. Prior to 1965 the custodian of the courthouse maintained signs on the public restrooms on the main floor of the courthouse. The restrooms were segregated. One restroom had a sign designating it as "Colored", two others displayed signs designating them as "White". In 1965 the colored sign was to some extent obliterated by paint over it. "Employees Only" signs replaced the "White" signs. This condition existed at the time of the trial in September 1968. There was testimony on behalf of plaintiffs to the effect that only colored people continued to use the restroom formerly designated as "Colored", and did not use the restrooms designated for "Employees Only". There are restrooms on the sec-

ond and third floors of the courthouse, but their use is not in question in this suit. The Court will concern itself with the ones located on the main floor of the courthouse.

Sheriff Hufstickler testified that there were three restrooms on the main floor of the courthouse; that one of these is being and would be used as a public restroom, and the other two would and are being used for employees only, one for female, the other for male employees. The restrooms for employees only are locked and only employees given a key. The public restroom has one door leading into it from the hallway, and, after you enter, the room is divided into two parts with doors leading to separate accommodations for men and women. There was not a sign on the door to designate its use at the time of the trial, but the Sheriff indicated he was having one painted to place on the door designating it is a restroom for the public.

█ It is clear from the evidence that the results of the manner in which defendant Sheriff has been and is now making use of the formerly public restrooms on the first floor continues in effect segregated restroom facilities for the public which have always existed in the past. The formerly colored restroom, with but one entrance from the hallway, and divided facilities on the inside, is still used only by colored people. The formerly white restrooms, one for men, the other for women, though now designated for the use of employees only, continue to be used by the white people. It is impermissable for governmental authorities to practice racial discrimination in the use of public facilities. Washington v. Lee, supra. Plaintiffs are entitled to appropriate injunctive relief on this issue.

THE COUNTY HOSPITAL. Humphreys County constructed a Hill-Burton Hospital in 1950, contributing its share of the construction costs from public funds. There was an addition to the hospital in 1960. In the beginning the county levied a tax for two years to se-cure its part of the construction money. Thereafter, the county levied a maintenance tax for one year. Since that time the hospital has been self supporting.

The hospital is operated by the county, pursuant to the authority granted by § 7129-55 et seq. Mississippi Code 1942, Annotated, Recompiled, through a Board of Trustees appointed by the Board of Supervisors. The trustees exercise the authority granted by statute for the operation of the hospital. The members of the Board of Trustees of the hospital were not made defendants. Members of the Board of Supervisors contend that since they have no authority to control the operation of the hospital, nor dictate its policies, and since they have not been required for many years to levy a tax to provide funds for the operation of the hospital, plaintiffs are not entitled to injunctive relief in regard to the operation of the hospital, even though the uncontradicted proof shows that the hospital is operated along segregated lines.

The Court takes judicial knowledge of the fact that a suit is now pending in this Court to desegregate the hospital, brought by three of the four plaintiffs herein, against the hospital and its Board of Trustees. Coleman v. Humphreys County Memorial Hospital, Civil Action No. GC 6847.

Plaintiffs contend that regardless of the fact that the hospital suit is pending in the Court, nevertheless the Court should enjoin the members of the Board of Supervisors in the case sub judice from contributing county funds for the operation or support of the hospital unless and until the hospital abandons its policies of racial segregation.

█ The Court is of the opinion and so finds that the frontal attack in the hospital suit is sufficient to afford plaintiffs and the class they represent any relief to which they may be entitled, and that injunctive relief in the case sub judice is not necessary or proper under the circumstances. The power to issue injunctions should be exercised with great caution and only where the reason and necessity therefor are clearly

established. 43 C.J.S. Injunctions § 15; Clark v. Thompson, D.C.Miss., 206 F. Supp. 539, affd., C.A., 313 F.2d 637, cert. denied, 375 U.S. 951, 84 S.Ct. 440, 11 L.Ed.2d 312.[13]

## MUNICIPAL SERVICES AND FACILITIES

PARKS, PLAYGROUNDS AND SWIMMING POOLS. The City of Belzoni has a Park Commission, created pursuant to § 3374–158, Mississippi Code 1942, Annotated, Recompiled. The power and duties of the Park Commissioners are defined and enumerated in Code § 3374–159. This section of the Code gives the Park Commissioners entire control and management of the parks, playgrounds and swimming pools of the city. The statute authorizes the Board of Aldermen to appropriate and pay over to the Park Commissioners annually such funds as may be necessary, in the opinion of the Board, to maintain the parks, playgrounds and swimming pools within the city. The statute provides for the handling of the funds by the Park Commissioners, who have the authority to hire and fire supervisory personnel, and direct their activities.

▮ The members of the Park Commission were not made parties to this action, and the Court is without power to direct the manner in which the Commission operates the municipal facilities under its control. Plaintiffs seek to reach the activities of the Commission in this action by an injunction prohibiting the Board of Aldermen from appropriating funds for the use of the Commission until the Commission has eliminated racial discrimination in the operation of the municipal facilities under its jurisdiction.

Plaintiffs invoke the rule that the Board of Aldermen cannot constitutionally continue to appropriate funds for the operation of recreational facilities on a racially discriminatory basis. Coffey v. State Educational Finance Committee, 296 F.Supp. 1389, S.D.Miss., January 29, 1969 (Three-Judge Court); Poindexter v. Louisiana Financial Assistance Commission, 296 F.Supp. 686, E.D.La., March 19, 1968, affd., Louisiana Education Commission for Needy Children v. Poindexter, 393 U.S. 17, 89 S.Ct. 48, 21 L.Ed. 2d 16 (1968); Poindexter v. Louisiana Financial Assistance Commission, 275 F. Supp. 833 (E.D.La.1967) affd. 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968).

The Court finds from the evidence in the case the following facts relating to the parks, playgrounds and swimming pools operated in Belzoni through its Park Commission.

At the time of the filing of this suit in 1965 the City of Belzoni owned one swimming pool and operated another under a lease agreement made in 1964 with its owner.

The pool owned by the city was an old pool and was used by the white people of the community. The other pool was a newer one and was used by the black citizens. This pool was near the Negro school.

In 1967 the old pool was sold to the Belzoni Jaycees, an organization composed of young business and professional men of the community for a consideration of $5,000.00. This pool has been operated since that time by this organization, although the Park Commission sponsors a summer swimming program there for white children, similar to the one which is conducted at the pool owned by the city for the black children. The

13. In Clark, the District Court said:
"The Supreme Court of the United States, in the case of Bailey et al. v. Patterson et al., 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512, held that the issuance of an injunction was an extraordinary and unusual writ. This, of course, does not announce any new law. The granting of an injunction is discretionary and dependent upon the facts of each case. It should be granted with great caution, care and deliberation on the part of the trier of the facts, and the power to issue injunctions should not be lightly indulged in, but exercised sparingly, after thoughtful deliberation and the presence of an urgent necessity." 206 F.Supp. 539.

other pool, leased in 1964, is operated by the Park Commission through its employees, and is used by the Negro children.

The pool sold by the city to the Belzoni Jaycees was constructed in 1930. At the time of its sale, it was in bad repair. The state of repair of the pool was one of the factors which influenced the decision of the Board of Aldermen to sell the pool. The Board also determined that the city, from a financial standpoint, could not maintain both pools.

The Park Commission operates four ball parks or playgrounds. Three of these are used primarily by white children, the other by Negro children. One park is owned by the city, the others belong to the school district, but are used by the Park Commission in its summer program.

The only witness for plaintiffs who testified about the use of the swimming pools and playgrounds was plaintiff Joe Nathan Coleman. This witness was not, at any time, denied the use of any of the facilities, and did not make any effort to use them. He stated that he might do so if others would join him, but he was afraid to do so alone.

The record does not show that there existed a forced segregation of the facilities by the governing authorities. The evidence shows, however, that, with the exception of one or two isolated instances, members of the white race elected to use three of the facilities, while members of the Negro race elected to use the other.

 The segregated use of public facilities is not prohibited or condemned by the Constitution. It is *forced* segregation of the facilities which is unconstitutional. Hanes v. Shuttlesworth, 5 Cir. 1962, 310 F.2d 303; City of Montgomery v. Gilmore, 5 Cir. 1960, 277 F.2d 364.

The Court does not feel justified in issuing an injunction against the members of the Board of Aldermen prohibiting them from the appropriation of funds for the use of the Park Commission, until and unless, the pools, playgrounds and parks are desegregated by the Park Commission.

As hereinbefore mentioned, injunctive relief should not be granted except in a clear case where there exists the necessity therefor, and, then, only when the objective can be readily obtained through its use.

Injunctive relief is not a matter of right, but its grant or refusal usually rests in the sound discretion of the Court, exercised in harmony with well established principles. 43 C.J.S. Injunctions § 14, p. 420. In the case sub judice should the Court enjoin the members of the Board of Aldermen from appropriating funds for the use of the Park Commission in the operation of the parks, pools and playgrounds of the city unless and until the Park Commissioners took affirmative action to desegregate them, the determination of when such action has been accomplished would necessarily rest with the Board, subject to the Court's review. This would be a cumbersome, time-consuming method of obtaining the objective. In the best such an approach would be awkward and difficult of accomplishment.

 The straightforward direct approach is to seek an injunction against the members of the Park Commission. In this manner immediate and direct relief could be accomplished, provided the facts warrant the intervention of the Court. The plaintiffs did not elect to bring the Park Commissioners into the action as parties defendant, although their absence was made known to them many months before the suit was tried. The Court does not intend to indicate in any way that such relief against the Park Commissioners would be forthcoming on the facts in the record in this case. The record does not reflect, in any way, that segregation of the pools and playgrounds has been forced upon the people of the community.

There is no evidence in the record that any member of the Negro race has at-

tempted to participate in any activity at the pool or playgrounds used by the white children, and, consequently no refusal of such use has been shown. The segregation is the result of a social custom of long standing. Whether the white children would make use of the pool and playground used by the Negro children, or vice versa, if invited to do so by the Park Commission, is, of course, a question to be answered in the future.

The Court holds and finds that injunctive relief is inappropriate against the members of the Board of Aldermen with reference to the swimming pool and park owned by the city and the summer program sponsored by the Park Commission at the pool owned by the Belzoni Jaycees and the playgrounds of the school district.

CEMETERIES. The evidence introduced in the case shows that there are two cemeteries in the City of Belzoni. One is a privately owned church cemetery. The other is owned and maintained by the city, but all lots or burial spaces therein have been sold to private individuals. The city does not have plans to acquire additional property for cemetery purposes. There has never been a colored person buried in this cemetery. The city is authorized by statute to purchase and hold real estate, either within or without the municipal boundaries, for all municipal purposes, including cemeteries,[14] and to maintain, repair, and enlarge the same.[15]

While the city is authorized to enlarge the cemetery which it owns, or acquire another one, plaintiffs do not have the constitutional right to require the city

to do so. The decision rests with the City Board and cannot be controlled by the Courts.[16]

It is the opinion of the Court and the Court finds, that plaintiffs are not entitled to injunctive relief against the members of the Board of Aldermen of the City of Belzoni with reference to cemeteries provided by the city in the exercise of its statutory authority.

POLICE AND FIRE PROTECTION. Plaintiffs present the issue of racial discrimination practiced by the officials of the City of Belzoni in police protection afforded the community. There are two sections of the city, formed as the result of custom and usage over the years. One section is inhabited by white people, the other by Negroes. One is known as the white section of town, the other the Negro section. Plaintiffs contend that the protection afforded the Negro section is inferior to that afforded the white section, and that their constitutional rights are violated in that regard.

The Court finds from the evidence that the police force of the City of Belzoni consists of the City Marshal, elected by the people, and eight policemen, three of whom are colored. The force has one police car, fully equipped. This car is used by the white policemen. The Marshal uses his own car, as do the Negro policemen. These private cars are not fully equipped police cars, and do not have police lights and insignia of the police force. The Negro policemen are primarily assigned to patrolling the Negro section, but patrol the white section of the city at times. They are authorized to and do arrest individuals of both

14. § 3374–112, Miss.Code, 1942 Annotated, Recompiled.

15. *Id.* § 3374–165.

16. City of Montgomery v. Gilmore, 5 Cir. 1960, 277 F.2d 364. This case deals with parks, but it appears reasonable that it should be extended to cemeteries. In this case, the court said:
 "We agree with the district court that no law, State or Federal, requires the City to operate public parks.[4]

 "[4]. In our opinion, the closing of all of the public parks of the City does not violate the equal protection of the laws of the citizens of Montgomery under the doctrine of James v. Almond, D.C.E.D.Va.1959, 170 F. Supp. 331; James v. Duckworth, D. C.E.D.Va.1959, 170 F.Supp. 342, and Harrison v. Day, 1959, 200 Va. 439, 106 S.E.2d 636."

races, when the circumstances warrant. The white policemen, on the other hand, use the regular patrol car of the force and go to the Negro section of the city when their services are needed.

It is clear to the Court that there is no difference between the police service which has been rendered the Negro section of the city from that rendered the white section. In other words, the Negro section has not been discriminated against in regard to police protection. While the evidence shows that the Negro policemen are primarily concerned with the Negro section and the white policemen with the white section, the entire force works throughout the city. This is a matter that is properly within the sound discretion of the city officials, and with which the Court should not interfere. There may be some inequities between the races within the Department as to working conditions, but this issue does not come within the scope of the issues properly before the Court. There is no evidence that any plaintiff has ever been employed by, or sought employment in, the Police Department of the city.

The Fire Department force consists of a Chief, four firemen and twenty volunteer firemen. The equipment consists of one city truck, a truck owned and furnished by the county, and an auxiliary truck. The department answers calls in the city and county. There are no Negroes on the fire force. Plaintiffs did not offer evidence of any discrimination in the protection afforded by the Fire Department, but appeared to base charges of discrimination on the fact that no Negroes served on the Fire Department.

Plaintiffs have never been employed in the Fire Department, nor have they, or either of them attempted to obtain a position there. There is no evidence that they have served as volunteers, or attempted to do so. They are not in a position to challenge racial discrimination in employment practices, nor in the selection of volunteers.

Since there is no evidence in the case to sustain the charge that services rendered the Negro community by the city for police and fire protection are inadequate or discriminatory, in any manner, it is the judgment of the Court that plaintiffs are not entitled to relief on these issues.

STREETS, SEWERS, SEWERAGE, FIRE PROTECTION, ETC. Since its incorporation in 1895, Belzoni has developed a residential pattern similar to that existing in most Southern communities of its size. As the result of custom and usage over this span of time there has developed a definite pattern of residential occupancy. The Negro citizens are grouped in certain sections of the city and white citizens in others. The white section of the city is occupied largely by home owners, while most Negro citizens rent their homes. The residences in the Negro section are built on small lots, resulting in a density of housing in the area, while the opposite is true in the white section.

Plaintiffs employed a City Planning Consultant to make a land use survey of the City of Belzoni. This survey was made in December 1965, and was updated in 1967 and again March 1968, and finally in September 1968, immediately before the trial.

The Consultant recorded the distinction between those residential areas which were white-occupied and those areas which were Negro-occupied.

This Consultant testified as a witness and there was introduced in evidence a map or plat of the City of Belzoni and some adjacent areas, which contains the information documented by this witness as of the date of the last inspection in 1968. This map depicts the Negro and white residential areas, the commercial, industrial, and public areas, as well as the parks, playgrounds and pools. The map also shows all streets and alleys in the city indicating which were not paved at the time of the last inspection. Fire hydrants and street lights are indicated on the map.

This witness also produced and introduced in evidence a map drawn by him as the result of his first inspection in 1965. This map contained the same type of information as is contained in the 1968 map, except the map reflects the conditions existing in 1965.

A comparison of the maps reflects that many of the streets in the Negro section which were not paved in 1965 have been paved since that time.

The 1968 map shows a number of unpaved streets but practically all of these streets are shown on the official map of the city to be alleyways. This witness referred to the alleys as streets because he found a number of Negro residences built on the alleys. The official map of the city shows the rights of way of these alleys to be very narrow, and not suitable to be used as streets.

The dedicated streets of the city, with the exception of one short street known as Lincoln Street, were paved at the time of the trial. Two alleys had been paved at the time of the trial. One of these was an alley situated in the business district and the other an alley near a church, the costs of which were partially borne by the church. The rest of the alleys were not paved.

In numerous instances residences were constructed facing alleys which were not paved and members of the Negro race, either owned or rented the houses.

Plaintiffs contend that the city discriminated against them and members of their class on account of their race, when the city would not pave the alleys. There are numerous alley rights of way in the white section of the city which are not paved.

The drainage, in the main, is provided by graded storm, water drainage ditches, running along each side of the street. These ditches in most instances are not separated from the yard of the adjoining property owner. Some of the ditches are well kept, while others are not. In instances when the ditches have been well kept, the adjacent property owners have maintained them.

The greater number of the well kept ditches are in the white section. Plaintiffs claim racial discrimination on account of the disparity existing in the Negro section with those in the white section.

The city maintains street lights sufficient to afford proper protection to its citizens. At places in the city, mainly in the white section, additional lights are placed in alleyways. This is done at the expense of the property owner.

Plaintiffs contend that there is a disparity between the white and Negro sections in the illumination of streets and alleyways, which is the result of racial discrimination.

The evidence shows that the city endeavored to provide adequate fire-hydrants for the city, in accord with recommendations of the state rating bureau. There are places in the city in white and black areas where additional fire-hydrants are needed. This fact was admitted by the Mayor of the city when he testified in the case.

Plaintiffs' main point offered to sustain their contention that disparity exists between the white and Negro sections in the furnishing of hydrants is bottomed on the density of the residences in the Negro section, which condition does not exist in the white section. Plaintiffs argue that more hydrants are needed in the Negro section than in the white section, because of the density of the buildings. This argument is not persuasive with the Court.

There is one area in the city which does not have sanitary sewers. This area is composed of a small addition known as "Bridges Addition", and four houses on Silver City road, located nearby. This area is inhabited by Negro residents. In 1963 the city made application for a government grant to help finance the installation of a sewerage system in this area, as well as paving for alleyways and other municipal improvements. The government refused to include the paving of the alleyways in the project because they were not considered

as streets. The city was not successful in securing the grant.

Plaintiffs claim racial discrimination because this small section of the city is without sanitary sewers. The evidence reflects that the city government is making a good faith effort to secure funds with which to provide this area with this service, and the Court can find no racial discrimination in this regard.

There is an area located just outside the city at the southwest corner known as "Hogtown," "Camptown" or "Germantown". Though outside the city the city Board furnishes water to the inhabitants of this area. The Board does not furnish any other municipal service. Section 3519–28, Mississippi Code, 1942, Annotated, Recompiled, authorizes the city to supply customers residing outside of and within five miles of the corporate limits with certain public utilities, including water and sewerage. Thus, the city is authorized to operate a water and sewerage system in the "Hogtown" area. The city, however, is not required to do this. There is not a Mississippi statute or other legal authority known to the Court which charges a Mississippi municipality with such a duty.

It is clear to the Court that the City of Belzoni does not owe any legal or moral duty to the inhabitants of this area to provide them with municipal services.

■ The City of Belzoni in July 1967, completed a 3½ year project for paving streets within the city. All of the unpaved streets in the city, except the one mentioned above, were paved in this project. This work was done under the supervision of a reputable consulting civil engineer. The evidence shows that double bituminous surface treatment was given the streets, which treatment in the opinion of the engineer, provided adequate and serviceable streets. The Court finds that the city officials have acted in good faith with reference to street paving, maintenance and repair, and are not guilty of any racial discrimination with reference to the same.

The Plaintiffs made sweeping charges in their complaint against the city officials. They challenged practically every service customarily provided its inhabitants by a Mississippi municipality. The case is bottomed on the premise that plaintiffs and members of the class represented by them have suffered racial discrimination.

■ The governing authorities of a municipality in the provision of public services and the operation of public facilities are entitled to the widest discretion, and the Courts should not undertake to control or interfere with the exercise of such discretion in the absence of bad faith or abuse. Hawkins v. Town of Shaw, U.S.D.C., N.D. of Miss., 303 F.Supp. 1162.

This position is supported by 62 C.J.S. Municipal Corporations § 199, p. 372, where it is stated: "As a general rule the acts of a municipal corporation, which are within its powers, are not subject to judicial review, unless there is a manifest and palpable abuse of power."

The evidence in this case does not sustain the charges made by plaintiffs. The Court finds that the defendant city officials acted in good faith in all matters of which complaint is made, and have not discriminated against plaintiffs or members of the class represented by them in the operation of municipal facilities and in provision of municipal services. The Court should not undertake to control the manner in which they perform their duties.

The evidence shows that there has been a segregation of the races in the use of the playgrounds and swimming pools; but, for the reasons set forth above, the Court does not feel that injunctive relief in this action is warranted.

In sum, the Court finds that plaintiffs are entitled to injunctive relief against the Sheriff and members of the Board of Supervisors of Humphreys County to desegregate the jail and restrooms in the

courthouse of the county, but are not entitled to any further relief in the case.

An appropriate order will be entered by the Court.