**UNITED STATES of America**

v.

**SARS OF LOUISIANA, INC., Gulf Soap Corporation, George F. Theobald, Felix R. Sapp, and Arnold Q. Ford.**

**Civ. A. No. 71-6.**

United States District Court,
E. D. Louisiana,
Baton Rouge Division.

March 30, 1971.

Gerald J. Gallinghouse, U. S. Atty., Eastern District of Louisiana, Don M. Richard, Asst. U. S. Atty., New Orleans, La., for United States of America.

Dudley Yoedicke, New Orleans, La., for defendants.

WEST, Chief Judge:

This is a suit brought by the United States of America pursuant to Section 302(a) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 332(a), which vests jurisdiction in this Court to restrain violations of 21 U.S.C.A. § 331(a). Title 21 U.S.C.A. § 331(a) provides:

"The following acts and the causing thereof are prohibited:

(a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded."

The defendants own and operate a rendering plant in Baton Rouge, Louisiana, where they process and prepare ingredients for animal food. In this suit the plaintiff alleges, and it is not disputed, that the materials produced by the defendants are in fact distributed by the defendants in interstate commerce, and that these materials are "foods" within the meaning of the Act. See 21 U.S.C.A. § 321(f). Plaintiff further contends that at the time of its inspection of the plant, the foods which the defendants were distributing in interstate commerce were adulterated within the meaning of 21 U.S.C.A. § 342(a) (1) in that these foods contained a poisonous and deleterious substance, i. e., Salmonella microorganisms and that these foods were further adultered in that they were prepared and held at the defendants' rendering plant under insanitary conditions rendering them injurious to health.

Defendants' plant was first visited by an inspector of the Food and Drug Administration in January of 1968. Certain deficiencies were noted at that time and called to the attention of the defendants. Apparently the deficiencies were not corrected by the defendants following that visit, and in July of 1970, another inspection was made. Photographs were taken in and about the plant and tests were made of the finished product leaving the plant and it was found that Salmonella microorganisms were indeed present. Defendants do not contest the fact that the presence of Salmonella microorganisms in their finished product constituted a violation of the Federal Food and Drug Act. It was stipulated between counsel that the presence of these microorganisms in the food product prepared by the defendant was dangerous to animals and that the disease which could result therefrom may be transmitted from animals to humans. The plant was again inspected in August of 1970, and at the trial before this Court it was stipulated between counsel that the deficiencies noted by the inspectors after both their July and August inspections constituted violations of the Food and Drug Act, and that the product leaving the plant was, in fact, contaminated in violation of the Act.

After the inspection which was made on August 13, 1970, the inspectors recommended:

(a) That the defendants install screening around the plant to prevent influx of flies and other insects into the plant proper.

(b) That the entire premises be completely cleaned to eliminate the presence of heavy grease residues on the cookers and on the floors beneath the cookers, and to eliminate the dirt and unclean conditions existing throughout the plant and its equipment.

(c) That the finished product be stored in proper storage facilities off of the floor and in a location separated from the raw products coming into the plant.

(d) That some method of control be implemented for the periodic cleaning and fumigating of both the equipment used in handling the raw product and the finished product in the plant and the trucks and other vehicles used in trans-

porting both the raw materials and the finished product.

This suit was filed by the Government on January 13, 1971, and was based entirely upon the conditions found by the inspectors during their inspections in July and August of 1970. The only relief sought by the Government is injunctive relief to prevent the defendants from operating their plant and from delivering or introducing into interstate commerce dried meat scraps or other food products unless and until the recommended corrective measures are taken to insure that no adulterated products will be produced in or emanate from the plant in violation of the Pure Food and Drug Act.

At the time this case was heard on February 12, 1971, the inspectors for the Food and Drug Administration did not know whether or not any of their recommendations had been carried out since their inspection in August of 1970, as no further inspection of the premises had been made since that time. But the evidence in the case clearly showed that all of the recommendations made by the inspectors have, in fact, been implemented by the defendants and indeed, additional precautions have been taken by the defendants to insure the purity of their product. Among the things done by the defendants since the inspection of August, 1970, are the following:

(a) They have erected a silo, separate and apart from the building wherein the raw materials are processed, and in which the finished product is now properly stored in such a manner as to keep it off the ground and in a separate container.

(b) The entire premises have been fenced in order to keep out dogs, cats, and other animals.

(c) The entire plant has been screened in order to eliminate flies, bugs, and other insects.

(d) All of the equipment in the entire plant has been painted and cleaned.

(e) Duplicate equipment has been purchased and is in use so that the equipment handling the raw product no longer handles the finished product.

(f) The section of the plant in which raw material is processed has been partitioned off with corrugated metal from the part of the plant handling the finished product.

(g) At least once each day all of the equipment coming in contact with the finished product, i. e., loading equipment, trucks, etc., is completely sanitized.

(h) The finished product now goes directly from the hopper to bins off the floor and it is then moved on conveyors to the press and then to trailers for shipping, never touching the floor.

(i) Shilstone Laboratories has been employed to conduct tests on finished products leaving the plant at least once each week, said tests being for the purpose of determining whether or not there is a presence of Salmonella microorganisms, or anything else that would in any way contaminate the finished product.

Since this new system has been put into effect, Shilstone Laboratories has conducted tests six times, and all tests are completely negative, showing no presence of anything that would contaminate the finished product leaving defendants' plant. Photographs were taken by the defendants following the implementation of these improvements, and were inspected by the Court and indicate that all of the improvements testified to have, indeed, been made. During the trial, before the defendants presented their side of this case, the Government inspector, while on the witness stand and under cross-examination, was asked whether or not if the recommendations made by him, i. e., that the plant be screened to eliminate flies and other insects; that the total premises be cleaned up; that the finished product be stored in containers off of the floor; that the moving equipment be either totally sterilized or separate equipment be used for raw products and for finished products; and that some means of quality control

and some method of periodic cleaning of equipment be implemented, were carried out, the operation would then, in his opinion, be a "safe" operation. His answer was that in his opinion, in all probability, if these recommendations were carried out, the operation would result in an uncontaminated product.

■ After hearing all of the evidence in this case, this Court finds as a fact that as of the time of this trial, all of the recommendations made by the inspectors have indeed been carried out and that the defendants have, in fact, gone beyond the scope of the recommendations of the inspectors and have made their plant a "safe" plant for the production of uncontaminated food products. There was absolutely no indication at the time of this trial of any present violations of the Food and Drug Act. While there is no question but that violations were present in August of 1970, it is also evident that the Government made no effort to determine whether or not the recommendations of their inspectors had been carried out since that time. This Court is convinced, from the evidence adduced at the trial in this case, that the defendants have, in fact, cured all of the deficiencies that existed in their plant in August of 1970, and the Court is further convinced that the defendants will, in the future, operate their plant in accordance with law, and that they will continue to employ all of the safeguards presently in use to assure the production of uncontaminated products.

■ While improvement is always to be sought, the law simply requires that the defendants operate their plant in such a manner as to produce uncontaminated products. The inspection system presently employed by the defendants is capable of and should result in immediate detection of any contaminated products, and there is certainly nothing in the evidence before this Court to indicate that if such contaminated products are detected, that the defendant will not

immediately take the necessary steps to eliminate such contamination. Should this Court be presented with evidence in the future of any relaxation in the use of these controls, it would, of course, take an entirely different view of this matter. There is, of course, no doubt that the power exists in the Court to issue an injunction if it is reasonable to expect that the defendants will commit violative acts in the future, despite the discontinuance of such legal conduct at the time the injunction is sought. See United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897–898, 97 L.Ed. 1303 (1953). See also Pullum and United States of America v. Greene, 396 F.2d 251 (C.A.5—1968). The Court is aware that:

> "[i]t is the duty of the Courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform * * *" United States v. Richberg, 398 F.2d 523, 530 (C.A.5 —1968).

But

> "[t]he power to issue injunctions should be exercised with great caution and only where the reason and necessity therefor are clearly established." Coleman v. Aycock, 304 F.Supp. 132, 140–141 (N.D.Miss.1969). See also 43 C.J.S. Injunctions § 15; Clark v. Thompson, 206 F.Supp. 539 (D.C. Miss.1962), aff'd 313 F.2d 637 (C.A.5 —1963), cert. den. 375 U.S. 951, 84 S. Ct. 440, 11 L.Ed.2d 312; Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962).

■ Thus, the critical determination in this case is whether or not it is reasonable to expect that the defendants will commit violative acts in the future. It is the conclusion of this Court, from the evidence adduced at the trial, that there is simply no showing that such violations are likely to reoccur. Therefore, since the reason and the necessity for the issuance of an injunction are not clearly established, injunctive relief will be denied. Judgment will be entered accordingly.