**UNITED STATES of America, Plaintiff,**

v.

**TOYS "R" US, INC., Charles Lazarus and Michael Goldstein, Defendants.**

**Civ. A. No. 90–3315 (MTB).**

United States District Court,
D. New Jersey.

Jan. 9, 1991.

Stuart M. Gerson, Asst. Atty. Gen., Office of Consumer Litigation, Dept. of Justice, by David Levitt, Asst. U.S. Atty., Office of Consumer Litigation, Dept. of Justice, Washington, D.C., and Michael Chertoff, U.S. Atty., Newark, N.J. by Susan A. Casell, Asst. U.S. Atty., for plaintiff.

Shea & Gould, New York City by Michael S. Feldberg, and Zazzali, Zazzali, Fagella & Nowak, Newark, N.J. by Robert A. Fagella, for defendants.

## OPINION

BARRY, District Judge.

## I. INTRODUCTION

Plaintiff United States of America alleges that defendant Toys "R" Us, Inc. ("Toys 'R' Us"), an importer, distributor, and retailer of children's toys and other articles; defendant Charles Lazarus ("Lazarus"), Chairman of the Board and Chief Executive Officer of defendant Toys "R" Us; and defendant Michael Goldstein ("Goldstein"), Executive Vice–President of defendant Toys "R" Us with supervisory responsibility, *inter alia*, for the importation and distribution of children's toys and other articles, violated the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. § 1261 *et seq.*, and the Consumer Products Safety Act ("CPSA"), 15 U.S.C. § 2051 *et seq.*

Plaintiff now moves for an injunction,[1] pursuant to Federal Rule of Civil Procedure 65, prohibiting defendants from (1) introducing or delivering for introduction in interstate commerce, or receiving in interstate commerce and delivering or proffering delivery of children's toys and other articles which qualify as banned hazardous substances under the FHSA; and (2) offering for sale, distributing in commerce, or importing into the United States children's toys and other articles which are banned hazardous products as defined by the CPSA.[2] Defendants move for summary judgment, pursuant to Fed.R.Civ.P. 56, and for sanctions, pursuant to Fed.R.Civ.P. 11. For the reasons that follow, plaintiff's motion for an injunction will be denied and, because no further relief is sought, the complaint will be dismissed. Defendants' motion for sanctions will be denied, and defendants' motion for summary judgment will be denied as moot.

## II. THE ALLEGED VIOLATIONS

Plaintiff alleges two violations of the CPSA and eleven violations of the FHSA. More specifically, it contends that defendants offered for sale, distributed in commerce, and imported into the United States (1) the "Music Maker;" and (2) the "Music Master Xylophone," musical children's toys that are coated with "lead-containing paint" and, thus, are banned hazardous products under the CPSA, in violation of 15 U.S.C. § 2068(a)(2). It contends, as well, that defendants introduced or delivered for introduction into interstate commerce or received in interstate commerce (1) the "Cutie Pie Deluxe Gift Set;" (2) "Pop Up Pals;" (3) "Sesame Street, Wind Up Ernie the Drummer;" (4) the "Pull Back Plane;" (5) the "Pull Back Train;" and (6) the "Pull Back Truck," a selection of children's toys that fail to comply with the CPSC's regulation concerning the production of small parts after prescribed use and abuse tests and, thus, comprise banned hazardous substances under the FHSA, in violation of 15

---

**1.** *See* 15 U.S.C. § 1267(a); 15 U.S.C. § 2071(a)(1).

**2.** With the consent of the parties, the hearing on the preliminary and final injunction applications has been consolidated.

U.S.C. § 1263(a) & (c). Finally, plaintiff contends that defendants introduced or delivered for introduction into interstate commerce or received in interstate commerce (1) the "Crib Pals Shake & Twist Rattle;" (2) the "Crib Pals Kitty Cat Lion Rattle;" (3) the "Crib Pals Tiny Tinkers 3 Piece Rattle Set" of which the "Crib Pals Tiny Tinkers Rattle Copter" is a part; (4) the "Baby Toy 'Wooden Shaky Head' Rattle;" and (5) "Crib Pals Play Shapes," an assortment of rattles that fail to comply with the test criteria for rattles as promulgated by the Consumer Products Safety Commission ("CPSC") and, thus, constitute banned hazardous substances under the FHSA, in violation of 15 U.S.C. § 1263(a) & (c).

■ Where, as here, an injunction is sought pursuant to statutory provisions, the movant must establish (1) a violation of the statute sued upon; and (2) a reasonable likelihood of future violations of the statute in the absence of injunctive relief. *United States v. Focht*, 882 F.2d 55, 57 (3d Cir. 1989).

### A. Statutory Violations

#### 1. Consumer Products Safety Act

■ A person violates the CPSA by "manufactur[ing] for sale, offer[ing] for sale, distribut[ing] in commerce, or import[ing] into the United States any consumer product which has been declared a banned hazardous product by a rule under this chapter." 15 U.S.C. § 2068(a)(2). Any children's toy or related article bearing "lead-containing paint"—*i.e.* "paint . . . containing lead or lead compounds and in which the lead content (calculated as lead metal) is in excess of 0.06 percent by weight of the total nonvolatile content of the paint or the weight of the dried paint film," 16 C.F.R. § 1303.2(b)(2)—constitutes a banned hazardous product under the CPSA. 16 C.F.R. §§ 1303.1(a)(1) & 1303.-4(b). Defendants do not dispute laboratory reports submitted by plaintiff which indicate that the "Music Maker" and the "Music Master Xylophone," toys imported into the United States and offered for sale and

distributed in commerce by defendant Toys "R" Us, were covered with paint containing in excess of 0.06% lead by weight in a dry paint film. *See* Nelson Decl. at Exhs. 19 & 21.

Instead, defendants rely upon a statutory exception to 15 U.S.C. § 2068(a)(2). Subsection (a)(2) does not apply to

> any person . . . who holds a certificate issued in accordance with section 2063(a) of this title to the effect that such consumer product conforms to all applicable consumer product safety rules, unless such person knows that such consumer product does not conform. . . .

15 U.S.C. § 2068(b). Therefore, 15 U.S.C. § 2068(a)(2) is inapplicable where the alleged violator, in addition to lacking actual knowledge of non-compliance with the safety rules, possesses a certificate which

> shall certify that such product conforms to all applicable consumer product safety standards, and shall specify any standard which is applicable. Such certificate shall accompany the product or shall otherwise be furnished to any distributor or retailer to whom the product is delivered. Any certificate under this subsection shall be based upon a test of each product or upon a reasonable testing program; shall state the name of the manufacturer or private labeler issuing the certificate; and shall include the date and place of manufacture.

15 U.S.C. § 2063(a).

Defendants do not hold certificates for the "Music Maker" and the "Music Master Xylophone" which meet the detailed requirements of 15 U.S.C. § 2063(a). Indeed, the "certificates" proffered by defendants are merely generic form letters which address some, but not all, of the concerns of the statute. *Compare* Carey Aff. at Exh. C *with* Carey Aff. at Exh. B *and* Nelson Decl. at Exh. 23. Although the "certificates" certify that items referenced on certain numbered purchase orders—which apparently correspond to shipments of these musical toys [3]—meet or surpass all applica-

---

**3.** Defendants have not provided copies of the purchase orders that are referenced by the four

"certificates" which purport to comply with § 2063(a). Nevertheless, a copy of one of these

ble CPSC standards, they provide only this blanket representation and fail to specify compliance with the Lead–Containing Paint Regulation or, for that matter, any other applicable safety regulation. Moreover, these "certificates" fail to include the date and place of manufacture of the "Music Maker" and "Music Master Xylophone" toys shipped to defendant Toys "R" Us. Defendants' "certificates" are insufficient to trigger the statutory exception to § 2068(a)(2) and, thus, plaintiff has established that the "Music Maker" and "Music Master Xylophone" are banned hazardous products under the CPSA.

### 2. Federal Hazardous Substances Act

A person violates the FHSA by "introduc[ing] or deliver[ing] for introduction into interstate commerce ... [or] receiv[ing] in interstate commerce any ... banned hazardous substance." 15 U.S.C. § 1263(a) & (c). Defendants do not dispute that the eleven children's toys or articles alleged by plaintiff to be banned hazardous substances under the FHSA were introduced or delivered for introduction into interstate commerce or were received in interstate commerce by defendant Toys "R" Us.

#### a. Non–Rattle Toys: Small Parts Regulation

Any toy or other article that is intended for use by children under three years of age and presents a choking, aspiration or ingestion hazard because of small parts is a "banned hazardous substance" under the FHSA. 16 C.F.R. § 1500.18(a)(9). A children's toy is deemed a choking, aspiration or ingestion hazard where it fits, without compression, entirely within a cylinder that has a diameter of one and one-quarter inches and a depth which slopes at a 45° angle from one inch to two and one-quarter inches. 16 C.F.R. § 1501.4(a) & (b)(1). If the toy does not fit entirely within the cylinder, it will be subjected to the "use and abuse" tests of 16 C.F.R. §§ 1500.51 & 1500.52. 16 C.F.R. § 1501.2(b)(2). Any

components or pieces of that toy that become detached during "use and abuse" testing and which fit entirely within the cylinder render the entire toy a choking, aspiration or ingestion hazard. *Id.*

The "use and abuse" battery of tests (*i.e.* impact test, bite test, flexure test, torque test, tension test and compression test) simulate the normal and reasonably foreseeable use, damage or abuse of the toy or other article by a child in the age group for which that toy or article is intended. 16 C.F.R. §§ 1500.51(a) & 1500.52(a). Consequently, the impact test for toys intended for use by children 18 months of age or less requires the toy to be dropped 10 times from a height of 4.5 feet plus or minus 0.5 inch, 16 C.F.R. § 1500.51(b)(3), and is more rigorous than the impact test for toys intended for use by children over 18 but less than 36 months which mandates 4 drops from a height of 3 feet plus or minus 0.5 inch. 16 C.F.R. § 1500.52(b)(3). A proper product sample for "use and abuse" testing must consist of at least 12 items, and if only one "use and abuse" test method is appropriate, all 12 items must be subjected to that test. Feldberg Aff. at Exh. F (CPSC Engineering Test Manual & CPSC Engineering Test Manual Requirements for Rattles); *see* Murphy Aff. at 15–16. Current CPSC policy dictates that the toy is designated a banned hazardous substance if two of the 12 items produce small parts during "use and abuse" testing ("two breaks"). Nelson Supp. Decl. at ¶ 7(G). If only one of the 12 items produces small parts after "use and abuse" testing ("one break"), the product is generally resampled and retested. *Id.*

#### 1. "Cutie Pie Deluxe Gift Set" and "Sesame Street, Wind Up Ernie the Drummer"

■ The parties disagree as to whether the "Cutie Pie Deluxe Gift Set" and "Sesame Street, Wind Up Ernie the Drummer" are intended for use by children under three years of age and, thus, are subject to the Small Parts Regulation. 16 C.F.R. § 1501.2(a). In determining, for purposes

purchase orders, number 66892, which is included in an exhibit submitted by plaintiff, concerns the "Music Maker." *See* Nelson Decl. at Exh. 19.

of the FHSA, whether toys or other articles are intended for use by children under three years of age, the following factors are relevant: (1) the manufacturer's stated intent (such as on a label) if that stated intent is reasonable; (2) the advertising, promotion, and marketing of the article; and (3) whether the article is commonly recognized as being intended for children under three. 16 C.F.R. § 1501.2(b). None of these three criteria is dispositive. *Toy Mfrs. of America v. Consumer Prod. Safety Comm'n*, 630 F.2d 70, 78 (2d Cir.1980).

█ The stated intent of the manufacturer of the "Cutie Pie Deluxe Gift Set" that this toy is suitable only for children of at least three years of age is reasonable. The packaging of the "Cutie Pie Deluxe Gift Set" specifically advises suitability for "Ages Three and Up." Furthermore, the only expert testimony regarding the reasonableness of this designation is the opinion of Dorothy Drago ("Drago"), an independent product safety consultant working for defendants, that because (1) the doll is relatively hard, as opposed to soft and cuddly; (2) the doll's limbs are not easily manipulated; (3) the doll's limbs and features are detailed and realistic; (4) the numerous accessories dictate a high level of complexity during play; and (5) the colors are entirely pastel, rather than bright primary colors, which younger children prefer, the labelling of the "Cutie Pie Deluxe Gift Set" for children aged three and over is clearly reasonable. Drago Dep. at 118, 125–26, 129; Drago Aff. at ¶ 4; *see also* Aber Aff. at ¶ 4. Indeed, Carol Pollack–Nelson ("Pollack–Nelson"), an engineering psychologist employed by the CPSC, concedes that the "Cutie Pie Deluxe Gift Set" is appropriate for children over three. Pollack–Nelson Dep. at 87, 89. She fails, however, to specifically address the reasonableness of the manufacturer's stated intent, concluding only that the "Cutie Pie Deluxe Gift Set" has many characteristics which appeal to children under three and that, consequently, she herself determined that it is intended for children under three years of age. *See id.* at 21–22; Pollack–Nelson Decl. at ¶ 4; Pollack–Nelson Supp. Aff. at ¶ 8. Accordingly, the reasonableness of

the manufacturer's designation that the "Cutie Pie Deluxe Gift Set" is intended for children aged three and over is uncontested.

Likewise, the statement of the manufacturer of "Sesame Street, Wind Up Ernie the Drummer" that this toy is intended for children of at least three years of age is reasonable. The "Sesame Street, Wind Up Ernie the Drummer" packaging correspondingly carries the admonition "Ages Over Three Years." Drago candidly admits that a determination as to whether "Sesame Street, Wind up Ernie the Drummer" is intended for children under three or children three and over is a close question that hinges upon a judgment that either the windup feature, which is appropriate for children three and older, or the brightly colored and familiar Sesame Street Ernie character, which carries large appeal with children under three, is the dominant feature of the toy. Drago Dep. at 135–36; Drago Aff. at ¶ 5. Although she concedes after "considerable reflection" that the Sesame Street feature is the dominant characteristic of the toy, she nonetheless concludes that the manufacturer's labelling of "Sesame Street, Wind Up Ernie the Drummer" for children three and over is not unreasonable. Drago Aff. at ¶ 5; *see also* Aber Aff. at ¶ 5. Because Pollack–Nelson failed to pass upon the reasonableness of designating "Sesame Street, Wind Up Ernie the Drummer" for children of at least three years of age, *see* Pollack–Nelson Dep. at 13–14; Pollack–Nelson Decl. at ¶ 5; Pollack–Nelson Supp. Aff. at ¶ 9, Drago's careful consideration and uncontested conclusion in support of the manufacturer's stated intent will control.

Moreover, plaintiff has presented no evidence that the "Cutie Pie Deluxe Gift Set" or "Sesame Street, Wind Up Ernie the Drummer" was advertised, promoted, or marketed for children under three, or that these toys are commonly recognized as being intended for children under three. Indeed, Pollack–Nelson explicitly concedes a lack of any such evidence with regard to the "Cutie Pie Deluxe Gift Set." Pollack–Nelson Dep. at 81, 82, 86. In contrast,

Thomas Carey ("Carey"), Director of Return Goods for defendant Toys "R" Us, avers that the "Cutie Pie Deluxe Gift Set" and "Sesame Street, Wind Up Ernie the Drummer" were offered for sale in sections of the Toys "R" Us stores containing merchandise intended primarily for children three and older. Carey Aff. at ¶ 14. Plaintiff has failed to satisfy its burden of establishing that either the "Cutie Pie Deluxe Gift Set" or "Sesame Street, Wind Up Ernie the Drummer" are banned hazardous substances received in and introduced into interstate commerce by defendants in violation of the FHSA.

### 2. "Pop Up Pals"

Plaintiff has submitted a CPSC laboratory report which indicates that "Pop Up Pals" sheds small component parts in violation of the Small Parts Regulation after "use and abuse" testing pursuant to 16 C.F.R. § 1500.51. *See* Nelson Decl. at Exh. 9. Defendants contend, however, that although "Pop Up Pals" was properly subject to the Small Parts Regulation and the "use and abuse" testing, the testing was invalid. First, defendants claim that the deposition testimony of Garfield Jenkins ("Jenkins"), a CPSC technician, establishes that during the impact test conducted on "Pop Up Pals," the toy was dropped from a height in excess of that mandated by the regulations, and that the laboratory report was falsified to reflect dropping from the proper height. Second, defendants assert that "Pop Up Pals" was improperly subjected to the more stringent impact test of 16 C.F.R. § 1500.51(b)(3) rather than the less demanding impact test prescribed by 16 C.F.R. § 1500.52(b)(3).

Jenkins' deposition testimony, when viewed in light of his subsequent declaration which clarifies this testimony,[4] indicates confusion with regard to the numerical label attached to the uniformly-marked drop height markers in the testing laboratory, rather than improper testing and falsified results. The confusion stems from an understandable lack of numerical facility during questioning with regard to

the § 1500.51(b)(3) drop height of 4.5 feet (*i.e.* four feet, six inches) plus or minus 0.5 inch (*i.e.* one-half inch). Jenkins seemingly testified at his deposition that during testing of "Crib Pal Play Shapes" pursuant to § 1500.51(b)(3) he repeatedly dropped the toy from a height of 5 feet yet indicated on the test data form that he had only dropped the toy from a height of 4 feet, 5½ inches, and that he and other CPSC technicians routinely followed this practice. Jenkins Dep. at 46–47, 67, 69. In fact, Jenkins was nervous and confused one-half inch with one-half foot. Jenkins Decl. at ¶ 3. In the testing laboratory, the wall is clearly marked with two parallel lines; one designates the release point for a drop of 4 feet, 5½ inches in accordance with § 1500.51(b)(3), and the other marks the release point for a drop of 2 feet, 11½ inches as specified in § 1500.52(b)(3). Jenkins Dep. at 46; Jenkins Decl. at ¶ 3. Jenkins himself and all his colleagues, to the best of his knowledge, perform the impact test with reference to the appropriate wall marks. Jenkins Dep. at 46–47; Jenkins Decl. at ¶ 3. Indeed, Robert Hundemer ("Hundemer"), Jenkins' supervisor, and Joseph Puskar ("Puskar"), a CPSC technician, each testified that they perform the impact test in accord with the reference marks on the wall. *See* Hundemer Dep. at 46–47, 52; Puskar Dep. at 25. Accordingly, I am not persuaded by defendants' claims of pervading irregularities in CPSC impact testing and, indeed, they did not press this issue at oral argument.

■ Moreover, defendants' contention that "Pop Up Pals" was subjected to an overly rigorous impact test is simply incorrect. Defendants argue that the laboratory test results are invalid because "Pop Up Pals" was, pursuant to § 1500.51(b)(3), dropped 10 times from a height of 4.5 feet plus or minus 0.5 inch, rather than subjected to the less stringent impact test in accordance with § 1500.52(b)(3), 4 drops from a height of 3 feet plus or minus 0.5 inch. The "Pop Up Pals" packaging specifies that the toy is intended for children "ages

---

4. Because the declaration serves to clarify, rather than contradict, prior deposition testimony, it will not be disregarded. *See Reitmeier v. Kalinoski,* 631 F.Supp. 565, 574 (D.N.J.1986).

18 months and up." *See* Nelson Decl. at Exh. 9. Consequently, that intended age range for the toy straddles the two infant age groups denominated for testing purposes: 18 months of age or less and over 18 months but not 36 months of age. Recognizing the potential for such overlap, the "Use and Abuse" Testing Regulation dictates that

> [i]f an article is marked, labeled, advertised or otherwise intended for children of ages spanning more than one of these age groups, the article will be subjected to the most stringent requirements.

16 C.F.R. § 1500.50(b)(1)(ii). The "most stringent" impact test is reserved for toys and other articles intended for children 18 months of age or less in conformity with § 1500.51(b)(3), *i.e.* 10 drops from a height of 4.5 feet plus or minus 0.5 inch. The CPSC performed the appropriate impact test on "Pop Up Pals" and, thus, plaintiff has met its burden of showing that the toy is a banned hazard substance pursuant to the FHSA.

### 3. "Pull Back Plane," "Pull Back Train," and "Pull Back Truck"[5]

Plaintiff has submitted CPSC laboratory reports detailing violations of the Small Parts Regulation by the "Pull Back Plane," the "Pull Back Train," and the "Pull Back Truck" after "use and abuse" testing. *See* Nelson Decl. at Exh. 18. In response, defendants argue only that Jenkins' deposition testimony establishes that all test reports proffered by plaintiff are unreliable and, thus, that these test results are suspect. Having determined that Jenkins' testimony does not indicate CPSC testing irregularities, I reject such rank speculation and find that plaintiff has established that the "Pull Back Plane," the "Pull Back Train," and the "Pull Back Truck" are banned hazardous substances within the meaning of the FHSA.

**5.** Defendants initially contended that the "Pull Back Plane," the "Pull Back Train," and the "Pull Back Truck" were also not intended for use by children under three years of age, but

### b. *Rattle Toys: Small Parts Regulation and Rattle Regulation*

Any rattle that fails to comply with the requirements of 16 C.F.R. § 1510 is a "banned hazardous substance" under the FHSA. 16 C.F.R. § 1500.18(a)(15). Pursuant to 16 C.F.R. § 1510, a rattle must satisfy the Small Parts Regulation in conjunction with "use and abuse" testing pursuant to 16 C.F.R. § 1500.51 both before and after a distinct safety test for rattles. 16 C.F.R. § 1510.3. Notwithstanding the "use and abuse" testing, no portion of the rattle under its own weight and in a non-compressed state can enter and penetrate the full depth of the cavity centered within the Rattle Test Fixture whose dimensions are set forth at Figure 1 of § 1510. 16 C.F.R. §§ 1510.3 & 1510.4.

### 1. "Crib Pals Shake & Twist Rattle," "Crib Pals Kitty Cat Lion Rattle," and "Crib Pals Play Shapes"

Plaintiff has submitted CPSC laboratory reports which indicate that components separated from the "Crib Pals Shake & Twist Rattle," the "Crib Pals Kitty Cat Lion Rattle," and the "Crib Pals Play Shapes" when subjected to "use and abuse" impact testing pursuant to 16 C.F.R. § 1500.51(b)(3), and that these components fully penetrated the Rattle Test Fixture. *See* Nelson Decl. at Exhs. 1, 3, 13. Defendants contend, however, that the "Crib Pals Play Shapes" is "not really a rattle." Moreover, defendants claim that based upon Jenkins' deposition testimony the "Crib Pals Shake & Twist Rattle," the "Crib Pals Kitty Cat Lion Rattle," and the "Crib Pals Play Shapes," like "Pop Up Pals," were subjected to overly rigorous impact testing and that the laboratory reports sanitized this improper testing. For the same reasons set forth above, I reject that contention out of hand. Finally, defendants assert that the test results on the "Crib Pals Shake & Twist Rattle," the "Crib Pals Kitty Cat Lion Rattle," and the

have now conceded that these toys were indeed intended for children under three, Drago Aff. at ¶ 6; Aber Aff. at ¶ 6, and, consequently, that the Small Parts Regulation applies.

"Crib Pals Play Shapes" are inconclusive because the results indicate that only two breaks occurred and that only six rather than 12 sample items were tested, thus making a retest appropriate.

■ For purposes of the FHSA, a "rattle" is defined as "an infant's toy, intended to be hand held, usually containing pellets or other small objects and which produces sounds when shaken." 16 C.F.R. § 1510.2. The "Crib Pals Play Shapes" is described by Carey as "a toy which contains a mirror, a whistle, a squeaker and a rattle." Carey Aff. at ¶ 12. A rattle, however, does not cease to be a rattle simply because other ornaments are appended to it. Thus, the "Crib Pals Play Shapes" is a rattle subject to the Rattle Regulation.

■ Furthermore, a retest is not appropriate for the "Crib Pals Shake & Twist Rattle," the "Crib Pals Kitty Cat Lion Rattle," and the "Crib Pals Play Shapes." It is immaterial that the CPSC tested less than twelve [6] of these rattles to arrive at two breaks. CPSC enforcement policy is clear that two breaks results in a finding that the tested product is a banned hazardous substance, mandating that testing proceed on the 12 items only until two breaks are realized, and defendants have not challenged this policy as arbitrary, capricious or an abuse of discretion. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Notwithstanding the deposition testimony of Jenkins and Hundemer which suggests that two breaks might, under some set of circumstances, trigger a retest, Jenkins Dep. at 48–49; Hundemer Dep. at 24–25, neither man had personal knowledge of a retest after two breaks under any circumstances. Accordingly, plaintiff has established that the "Crib Pals Shake & Twist Rattle," the "Crib Pals Kitty Cat Lion Rattle," and the "Crib Pals Play Shapes" are banned hazardous substances under the FHSA.

2. "Crib Pals Tiny Tinkers 3 Piece Rattle Set," "Crib Pals Tiny Tinker Rattle Copter," and "Baby Toy 'Wooden Shaky Head' Rattle"

Plaintiff has submitted CPSC laboratory reports detailing that components of the "Crib Pals Tiny Tinkers 3 Piece Rattle Set;" the "Crib Pals Tiny Tinker Rattle Copter," which is one component of that set; and the "Baby Toy 'Wooden Shaky Head' Rattle" fully penetrated the Rattle Test Fixture in the absence of "use and abuse" testing. Nelson Decl. at Exhs. 7, 11. In response, defendants argue only that Jenkins' deposition testimony establishes that all test reports proffered by plaintiff are unreliable and, thus, that these test results are suspect. Having determined that Jenkins' testimony does not indicate CPSC testing and/or reporting irregularities, I again reject such rank speculation and find that plaintiff has established that the "Crib Pals Tiny Tinkers 3 Piece Rattle Set," the "Crib Pals Tiny Tinker Rattle Copter" and the "Baby Toy 'Wooden Shaky Head' Rattle" are banned hazardous substances within the meaning of the FHSA.

3. Conclusion

In sum, plaintiff has established that defendant Toys "R" Us has committed two violations of the CPSC and nine violations of the FHSA.

B. *Reasonable Likelihood of Future Violations*

■ The purpose of injunctive relief awarded pursuant to statutory authority is not to punish a violator, but to deter the violator from committing future violations. *Securities and Exchange Comm'n v. Bonastia,* 614 F.2d 908, 912 (3d Cir.1980). In determining whether a movant has satisfied its burden of showing a reasonable likelihood of future violations in the absence of injunctive relief, courts generally consider, among other factors, (1) the degree of scienter involved on the part of the defendant; (2) the isolated or recurrent na-

---

**6.** It appears from the laboratory reports that the CPSC actually tested 9 of the "Crib Pals Shake & Twist Rattle," 6 of the "Crib Pals Kitty Cat Lion Rattle," and 7 of the "Crib Pals Play Shapes."

ture of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the sincerity of the defendant's assurances against future violations; and (5) the nature of the defendant's occupation. *Id.* It is deemed important to consider as well the defendant's voluntary cessation of challenged practices, *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982), the genuineness of the defendant's efforts to conform to the law, *Securities and Exchange Comm'n v. Torr*, 87 F.2d 446, 450 (2d Cir.1937), the defendant's progress towards improvement, *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir.1987), and the defendant's compliance with any recommendations made by the government. *United States v. Sars of Louisiana, Inc.*, 324 F.Supp. 307, 310 (E.D.La.1971). Essentially, the court must make a prediction of the likelihood of future violations based upon an assessment of the totality of the circumstances surrounding the violator and the violations that were committed. *Securities and Exchange Comm'n v. Bonastia, supra*, 614 F.2d at 912.

 I am troubled by aspects of defendants' past conduct with regard to the safety of the toys and rattles that it has imported and sold. Parents by the thousands placed their trust in the professionalism and safety-consciousness of the nation's largest children's specialty retail chain and purchased rattles for their infants and toys for their young children, at least some of which had the real potential to snuff out the very lives that they were intended to enrich. Little did these parents know that defendant Toys "R" Us' efforts at quality control were, at best, ad hoc.

To a disinterested observer it may seem anomalous that while defendants have committed two violations of the CPSA and nine violations of the FHSA[7] and anticipate approximately 16 product recalls this fiscal year, plaintiff concedes that they have not willfully or knowingly violated these laws. Certainly, given the nature of the retail toy business and the position of Toys "R" Us within that business, even with the most vigorous efforts at quality control it is not surprising that something can fall through the cracks. Toys "R" Us retails thousands of different toys and rattles each year which it acquires from hundreds of different foreign and domestic manufacturers and suppliers.[8] To a certain extent, then, it was required to rely upon these numerous manufacturers and suppliers to provide only items that conform to the CPSA and the FHSA. However, up until recently, with a system of form compliance "certificates" from vendors and manufacturers and sporadic independent testing, it relied too heavily upon others to assure that it sells safe toys and rattles. From the nation's largest retailer of children's toys more was required.

There are, however, many positive signs that Toys "R" Us is now making substantial efforts at quality control, and has been doing so since 1988. Toys "R" Us has not imported any of the "Crib Pals" rattles since 1988, and has no future plans to sell them or any other private label rattles. Carey Aff. at ¶ 11. Moreover, upon notification by the CPSC of suspected violations, the company ceased the importation and sale of every product that has been determined herein to constitute either a banned hazardous product under the CPSA or a banned hazardous substance under the FHSA, as well as the two non-violative

---

7. This is not meant to imply that there are no other toys or rattles which violate the CPSC or the FHSA.

8. Indeed, as of November 1, 1989, there were 16,913 different products on sale in Toys "R" Us stores, and approximately 25,000 products have been on sale over the four year period at issue here. Carey Aff. at ¶¶ 3, 4. It is wholly unclear how many of these products were tested to arrive at the eleven violations found here, and there is nothing in the record which indicates

how many products—perhaps hundreds or thousands—were examined in a more cursory fashion before those which were to be tested were selected. There is, therefore, no reasoned basis for knowing whether the toys and rattles which are the subjects of the eleven violations were randomly selected for testing from the thousands on sale in Toys "R" Us stores or whether they were selected because it appeared that, out of those thousands, those few posed potential problems.

products. *Id.* at ¶ 6. Indeed, Toys "R" Us stopped selling five of the thirteen items at issue herein before a request to that effect from the CPSC, and reported three of the thirteen to the CPSC before the Commission had even collected testing samples. *Id.* at ¶¶ 6, 8. Toys "R" Us has, as well, cooperated in and successfully executed every product recall requested by the CPSC, except for two instances in which the company contested the finding of a possible violation and the CPSC determined that test results were incorrect. *Id.* at ¶ 7.

I am persuaded that Toys "R" Us' commitment to product safety is genuine, rather than a reaction to the initiation of this August 1990 legal action, although it certainly appears that the most significant steps taken in fulfillment of that commitment were in reaction to the growing number of violations. In 1988, Toys "R" Us formed a Corporate Product Safety Committee which holds formal quarterly meetings as well as special sessions to address particular safety issues. *Id.* at ¶ 17. The company also periodically sponsors corporate seminars regarding CPSC guidelines and requirements. *Id.* at ¶ 18. Moreover, in February 1989, Toys "R" Us distributed to all of its buyers and merchandise managers a new in-house publication entitled "Comprehensive Handbook on Product Safety and Regulatory Compliance." *Id.* at ¶ 19.

Most importantly, however, the company hired ACTS Testing Labs, Inc. ("ACTS") in or about May 1989 to design and implement a comprehensive testing and inspection program. *Id.* at ¶ 20. Toward that end, ACTS reviewed all of Toys "R" Us' domestic and imported private label items to ensure compliance with federal safety regulations. *Id.* This testing of more than 600 toys resulted in only one recall, the "Music Master Xylophone," which the company initiated by promptly informing the CPSC of the potential safety hazard. *Id.* at ¶ 21. Significantly, by January 1991, ACTS will begin to test every product for which Toys "R" Us is the importer of record for conformance with the provisions of the CPSA and the FHSA, both private and non-private label products. *Id.* at ¶ 22. Accordingly,

[t]he inspection system [to be] employed by the defendants is capable of and should result in immediate detection of any contaminated products, and there is certainly nothing in the evidence before this Court to indicate that if such contaminated products are detected, that the defendant[s] will not immediately take the necessary steps to eliminate such contamination.

*United States v. Sars of Louisiana, Inc.,* *supra,* 324 F.Supp. at 310.

Parenthetically, I note with some dismay that plaintiff appeared more interested in filing this action and obtaining an injunction than in responding to defendants' appeals for guidance in improving its quality control procedures, even assuming that those appeals were not entirely altruistic. In a ten-page letter to plaintiff dated May 9, 1990, Toys "R" Us outlined its then current safety procedures, explained intended improvements to those procedures, and requested suggestions for modifications and additional improvements, yet received a negative response. Toys "R" Us was again rebuffed by plaintiff in response to a letter of May 29, 1990 which suggested a meeting between the top management of the company and the Commissioners of the CPSC to discuss safety procedures. Indeed, during a telephone conversation with plaintiff on May 31, 1990, the company appealed for any input from the CPSC regarding safety procedures with the goal of reaching a written agreement and again proposed a high-level meeting, but was told by plaintiff that it would take no initiative in the absence of a consent injunction. Finally, in a letter dated June 26, 1990, Toys "R" Us, in addition to making a third request for a meeting between top executives and the Commissioners, detailed its frustration at the absence of any reformatory guidance from the CPSC and the perceived preoccupation of plaintiff with seeking injunctive relief. In response, plaintiff filed suit. Indeed, this unwillingness to provide quality-control guidance and insistence upon a consent injunction was articulated at oral argument when, in answer to the court's inquiry as to why plaintiff would

not talk to Toys "R" Us about what it was required to do, counsel responded "they want to be in business, let them figure [it] out." Tr., Oct. 30, 1990, at 51.

Whether defendants are reasonably likely to violate the CPSA and the FHSA in the future is a close question if for no other reason than, given Toys "R" Us' sheer size and volume, a slip-up is not unimaginable. However, considering the totality of the circumstances, I believe that injunctive relief is not warranted. The deciding factor in reaching this decision is defendants' representation, which I find credible and accept, that ACTS will begin testing all private and non-private label products for which Toys "R" Us is importer of record by January 1991. I note that in the absence of timely imposition of this broad testing program and improvements of that program when improvements are deemed necessary, a court might well conclude that injunctive relief is appropriate when faced with even one additional violation of the CPSA or the FHSA. For now, however, plaintiff has not established a reasonable likelihood of future violations of the CPSA or the FHSA by defendants and, thus, its motion for an injunction is hereby denied.

There being no basis for statutory injunctive relief, the only relief plaintiff requested in its complaint, the complaint will be dismissed and defendants' motion for summary judgment denied as moot. With regard to defendants' motion for sanctions, it is clear that plaintiff's conduct in instituting this action was not "frivolous, legally unreasonable, or without factual foundation." *See Lieb v. Topstone Indus., Inc.,* 788 F.2d 151, 157 (3d Cir.1986).