### UNITED STATES of America

v.

### RICHLYN LABORATORIES, INC., a Corporation and Richard S. Weinberg, An Individual.

#### Civ. A. No. 92–5464.

United States District Court, E.D. Pennsylvania.

Oct. 1, 1992.

·David A. Garrison, U.S. Attorney's Office, Philadelphia, PA, Jacqueline H. Eagle, Dept. of Justice—Consumer Litigation, Washington, DC, for plaintiff.

William J. Barker, Jr., Frederick J. Bosch, Stradley, Ronon, Stevens & Young, Philadelphia, PA, for defendants.

## DECISION

JOYNER, District Judge.

The Plaintiff United States of America hereby seeks to enjoin the Defendants from continuing their pharmaceutical manufacturing and shipping operations until such time as the Food and Drug Administration (FDA) finds them to be in compliance with applicable federal law and regulations. On September 21, 1992, this Court issued a temporary restraining order, which order was extended on September 25, 1992 and is to remain in effect pending our issuance of this decision. The parties have presented evidence over the course of two days of hearings, and we now make the following factual findings.

## FINDINGS OF FACT

1. Defendant Richlyn Laboratories, Inc. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a place of business located at Castor and Kensington Avenues in Philadelphia, Pennsylvania. Richlyn Laboratories is engaged in, among other things, the business of manufacturing, processing, repacking and distributing prescription and over-the-counter drugs in interstate commerce using both generic and private brand names. Defendant manufactures 75 different drug substances in different dosage forms and strengths. Of the 75 drug substances manufactured by the firm, 40 require a prescription. (Declaration of Loren Y. Johnson; N.T. 9/22/92, 90)

2. Defendant Richard S. Weinberg is and for the last fifteen years has been the President of Richlyn Laboratories, Inc. Prior to assuming the position of President, Mr. Weinberg was the Vice President of Richlyn Laboratories and has approximately twenty-five years of experience in the drug manufacturing industry. (N.T. 9/22/92, 84–85, 103)

3. As President, Mr. Weinberg is responsible for and has authority over all of Richlyn Laboratories' operations including ensuring that the firm complies with CGMP regulations.

4. Beginning on March 2, 1992 and ending on April 8, 1992, U.S. Food and Drug Administration investigators Monica S. King and Richard C. Cherry and chemists Joanne Heim and S. Nasir Ali conducted a general inspection of Richlyn Laboratories for purposes of ascertaining whether the defendant company was in compliance with the Agency's Current Good Manufacturing Practice regulations. (CGMP's) (N.T. 9/22/92, 7–9)

5. The Current Good Manufacturing Practices is a set of regulations designed to ensure that prescription and over-the-counter drugs are manufactured in such a way that they meet the requirements of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, *et seq.* as to safety and have the identity and strength and meet the purity characteristics that they purport or are represented to possess. (21 C.F.R. 210.1(a); N.T. 9/22/92, 7)

6. As a result of its March–April 1992 inspection, the Plaintiff (U.S.F.D.A.) issued a Form FDA 483 Notice of Inspectional Observations. The FDA 483 contained thirty (30) observations of what the FDA believed were breaches of the CGMP regulations and was issued to Richard Weinberg, as President of Richlyn Laboratories on April 8, 1992. (Exhibit G–1; N.T. 9/22/92, 37)

7. The March–April, 1992 inspection revealed the existence of some thirty deficiencies in Richlyn Laboratories' overall operations primarily in the areas of validation, cross-contamination and stability testing.[1]

8. The FDA 483 did not establish a time frame for Richlyn Laboratories to cure the deficiencies listed therein. Rather, FDA expected that the deficiencies would be cured "as soon as possible." (N.T. 9/22/92, 38–39; Exhibit G–1)

9. In addition to forwarding a 483 Notice of Inspectional Observations, the Food and Drug Administration may also issue a warning letter informing an offending company of objectionable conditions, may force a seizure of such a company's goods by the United States Marshal's Service, or may institute injunction or prosecution proceedings. None of these actions was taken against Richlyn

---

1. Validation may be loosely defined as the method by which a manufacturer ensures that a system or product does what it is purported to do and is what it purports to be. Cross-contamination is of obvious concern in the drug manufacturing industry in that it refers to those situations in which the ingredients or chemical properties utilized in the production of one drug become co-mingled with those of another drug. Finally, stability testing concerns itself with ensuring that a given product remains potent until its stated expiration date. According to the April 8, 1992 FDA 483 issued in this case, Richlyn Laborato-ries does not have validation data or protocols for many of its products, it does not have and/or is not following its validation protocols for those products for which it does have protocols, it is not following its protocol for stability testing and/or is not conducting its testing with properly calibrated machines. The March–April inspection further revealed that Richlyn's system for controlling air flow in the capsule/tablet compressing chambers was inadequate to prevent dust and particulates from being transferred from one tablet or capsule compression area to another.

Laboratories immediately after the March–April, 1992 inspection. (N.T. 9/22/92, 51–53)

10. In response to the FDA 483 which he received on April 8, 1992, Richard Weinberg, in his capacity as President and the most responsible party at Richlyn Laboratories, Inc. prepared and submitted a nearly 200-page response to Observations 1–18 to Loren Johnson, the Philadelphia District Director of FDA on April 22, 1992. Mr. Weinberg submitted a second response, consisting of approximately 100 pages, to Observations 19–30 on May 7, 1992. In both responses, Mr. Weinberg stated that "while we do not necessarily agree with all of [the FDA's] observations, we have engaged consultants to assist us in taking corrective action to bolster our controls in those areas which caused a concern to the investigators." (N.T. 9/22/92, 85–88; Exhibits D–1, D–3).

11. The FDA has yet to directly respond in any way to Mr. Weinberg's correspondence of April 22 and May 7, 1992. (N.T. 9/22/92, 41–42, 87)

12. Ostensibly because of the FDA's findings during the March–April, 1992 inspection, Defendants retained one Ira Piene, a consultant, to assist them in preparing and implementing a validation protocol which would cure the deficiencies which then existed in that area. In August, 1992, another validation consultant, John Panek, was retained and in September, 1992, the company retained still another consultant, Philip Seeler. (N.T. 9/22/92, 92–94)

13. In June, 1992, the Plaintiff's inspection team returned to Richlyn Laboratories for purposes of determining whether the deficiencies found in the March–April inspection had been remedied. (N.T. 9/22/92, 39)

14. Although the dusty conditions in the compression area were somewhat improved and validation procedures had been developed for eight products, the June, 1992 inspection nevertheless revealed that some 24 deficiencies still remained to be cured. These deficiencies were again outlined on a Form 483 Notice of Inspectional Observations and issued to the defendant company on June 22, 1992. (N.T. 9/22/92, 27–29, 26, 41–42; Exhibit G–2)

15. No further action other than the issuance of a 483 Notice was taken by the FDA against Richlyn Laboratories immediately after the June, 1992 inspection. (N.T. 9/22/92, 52, 99)

16. In early September, 1992, the Philadelphia District Office of U.S.F.D.A. received a report from its manufacturing surveillance branch that on August 10, 1992, a pharmacist in Albuquerque, New Mexico had found a foreign tablet in a bottle of Rugby Laboratories cortisone acetate 25 mg tablets, lot number 44784. The Denver, Colorado District Office had initially investigated the matter with the New Mexico pharmacist and requested that the Dallas District Office arrange to pick up intact samples from the same lot number from the drug's distributor in El Paso, Texas. (N.T. 9/22/92, 68; Exhibit D–2; Declaration of Dan L. Dirks, R.Ph.)

17. On September 9, 1992, an FDA inspector collected a sample of six 100 tablet bottles of Rugby Laboratories cortisone acetate 25 mg tablets, all from lot no. 44784 from the McKesson Drug Co. located at 11401 Pellicano Drive in El Paso, Texas. The sample was then shipped via Federal Express to the FDA Laboratory at 2nd and Chestnut Streets in Philadelphia for analysis. (Declaration of Elvia J. Lopez; Exhibit G–5)

18. The sample arrived at the Philadelphia Laboratory on Friday, September 11, 1992 and was immediately placed, locked and secured in the records office of the Science Branch. On Monday, September 14, 1992, the sample was transferred to the FDA Sample Custodian who, after determining that it had arrived intact and undisturbed, placed it in the sample storage room. (Declarations of Marion H. Holmes and Richard E. Needham; Exhibit G–5)

19. Later that same day, the sample was given to S. Nasir Ali, an FDA Philadelphia District Chemist for analysis. Mr. Ali opened four of the six bottles contained in the sample in the presence of Karyn Campbell Bowen, an FDA Compliance officer. In the first bottle examined, six tablets were found bearing the marking 01153677; in the second and third bottles, eight such tablets were found and in the fourth bottle, 10 tab-

lets bearing the aforesaid numerical designation were discovered. (N.T. 9/22/92, 70–71; Declarations of S. Nasir Ali, Karyn C. Bowen and Germain S. Williams; Exhibit G–5)

20. 0115 is the National Drug Code ("NDC") identification number for Richlyn Laboratories, Inc. 3677 is the NDC number for Hydrochlorothiazide 100 milligrams and 2920 is the NDC number designated to identify cortisone acetate 25 milligrams. (N.T. 9/22/92, 69–70, 101)

21. Further analysis of the tablets contained in the four sample bottles was performed by Nasir Ali, which analysis showed that *all* of the tablets contained in the four bottles were, in fact, cortisone acetate including those embossed with the NDC number for Hydrochlorothiazide 100 mg. However, the tablets that contained the Hydrochlorothiazide identification numbers were found to weigh slightly less than those marked with the 2920 identification code. (N.T. 9/22/92, 71–72; Exhibit G–6)

22. The August, 1992 co-mingling and misidentification incident occurred when a punch with the incorrect identification number was put into the tablet compression machine at the time that the defendant company was setting up for the manufacture of lot number 44784. (N.T. 9/24/92, 21–22, 51, 85)

23. The type of product misidentification such as was discovered in August, 1992 poses a serious threat to the public health, safety and welfare in that it could result in a patient's taking the wrong medication or in a misdiagnosis in a case involving a drug overdose. (N.T. 9/24/92, 23, Declaration of John W. Levchuk, Ph.D)

24. Full compliance with CGMP Regulations could and should have prevented a co-mingling/tablet misidentification incident such as was discovered in August, 1992. (N.T. 9/24/92, 23–24, 51–52)

25. Richlyn Laboratories had previously been cited by the FDA for various inadequacies in its drug manufacturing and processing operations and for failure to comply with Current Good Manufacturing Practices in September, 1964 and in January, 1990. In September, 1964, the Plaintiff commenced injunction proceedings which eventually culminated in the entry of a preliminary injunction by consent. The January, 1990 inspection resulted in the issuance of a regulatory letter whereby FDA notified the Defendants that it would not approve those products affected by the Company's validation violations. (N.T. 9/22/92, 64, 75, 104; Declaration of Loren Johnson) *See Also: U.S. v. Richlyn Laboratories, Inc.*, 365 F.Supp. 805 (E.D.Pa. 1973).

26. Although Defendants originally took the position that the tablet co-mingling and misidentification incident which was discovered in New Mexico was not and could not have been the result of a product mix-up at their facility, at the conclusion of the September 22, 1992 hearing in the matter, they determined that the tablets had, in fact been mismarked in the course of the production process. Richlyn Laboratories has since contacted FDA and instituted a recall of the affected batches. (N.T. 9/22/92, 99–101; N.T. 9/24/92, 85; Exhibit D–1)

27. In addition to the recent recall of cortisone acetate tablets, the Defendants instituted product recalls in 1989, 1990 and 1991. In August, 1991 the company recalled methyltestosterone tablets due to a tablet mix-up; in February, 1990 it recalled thyroid tablets found by FDA to be subpotent and in May, 1989 meprobamate tablets were recalled because diethylcarbamazine citrate had been mislabeled as meprobamate. (Declaration of Loren Johnson)

28. Generally speaking, it is the responsibility of a drug manufacturing-processing company to comply with the CGMP Regulations and the provisions of the Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.* The Food and Drug Administration is an auditing agency responsible for ensuring that drug manufacturers are in compliance with the Act and the Regulations. (N.T. 9/24/92, 37)

29. The Defendants initially responded to FDA's January, 1990 inspectional observations in a fashion similar to their April 22 and May 7, 1992 responses in that they expressed concern about actual or potential violations of CGMP and stated that they were anxious to maintain a high compliance level with the

CGMP regulations. (Declaration of Loren Johnson; Exhibits E and F)

## DISCUSSION

■ It has long been recognized that the grant of injunctive relief is an extraordinary remedy which should be granted only in limited circumstances and only upon a showing by the moving party: (1) of the reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. Moreover, while the burden rests upon the moving party to make these two requisite showings, the Court should also take into account, when relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest. *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3rd Cir.1989), citing *In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137, 1143 (3rd Cir.1982). *See Also: Government of Virgin Islands, Department of Conservation & Cultural Affairs v. Virgin Islands Paving, Inc.,* 714 F.2d 283, 285 (3rd Cir.1983).

■ Where, however, an injunction is being sought pursuant to a statutory provision, a different standard is to be applied. *U.S. v. Toys "R" Us, Inc.,* 754 F.Supp. 1050, 1053 (D.N.J.1991). Indeed, because Congress has seen fit to act in a given area by enacting a statute, irreparable injury must be presumed in a statutory enforcement action. *United States v. Odessa Union Warehouse Co–Op,* 833 F.2d 172, 176 (9th Cir.1987). The passage of the Food, Drug and Cosmetic Act is, in a sense, an implied finding that violations will harm the public and ought to be restrained if necessary. *United States v. Diapulse Corporation of America,* 457 F.2d 25 (2nd Cir.1972). In actions for statutory injunctions then, the moving party need show only that probable cause exists to believe that the statute in question is being violated and that there is some reasonable likelihood of future violations. *Instant Air Freight Co. v. C.F. Freight, Inc., supra* at 803; *Commodity Futures Trading Commission v. Hunt,* 591 F.2d 1211, 1220 (7th Cir.1979), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979), *rehearing denied,* 444 U.S. 888, 100 S.Ct. 189, 62 L.Ed.2d 122 (1979). No specific or immediate showing of the precise way in which violations of the law will result in public harm is required. *United States v. Diapulse Corp., supra,* 457 F.2d at 28.

■ In determining whether a movant has satisfied its burden of showing a reasonable likelihood of future violations in the absence of injunctive relief, it has been held that the Court may consider, among other factors, (1) the degree of scienter involved on the part of the defendant; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the sincerity of the defendant's assurances against future violations; and (5) the nature of the defendant's occupation. It is deemed important to consider as well the defendant's voluntary cessation of challenged practices, the genuineness of the defendant's efforts to conform to the law, the defendant's progress toward improvement and the defendant's compliance with any recommendations made·by the government. *U.S. v. Toys "R" Us, Inc., supra,* 754 F.Supp. at 1058–1059 citing, *inter alia, City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982); *United States v. Odessa Union Warehouse Co–Op, supra,* 833 F.2d at 176; *United States v. Sars of Louisiana, Inc.,* 324 F.Supp. 307, 310 (E.D.La.1971).

■ Furthermore, while past misconduct does not lead necessarily to the conclusion that there is a likelihood of future misconduct, it is highly suggestive of the likelihood of future violations and the court should therefore look at the totality of the circumstances and any factors suggesting that the infraction might not have been an isolated occurrence. *Commodity Futures Trading Commission v. Hunt, supra,* 591 F.2d at 1220 citing, *inter alia, SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2nd Cir. 1975).

The Food, Drug and Cosmetic Act, 21 U.S.C. § 331 prohibits:

(a) The introduction or delivery for introduction into interstate commerce of any food, drug, device or cosmetic that is adulterated or misbranded.

(b) The adulteration or misbranding of any food, drug, device or cosmetic in interstate commerce.

(c) The receipt in interstate commerce of any food, drug, device or cosmetic that is adulterated or misbranded and the delivery of proffered delivery thereof for pay or otherwise.

(d) The introduction or delivery for introduction into interstate commerce of any article in violation of section 344 or 355 of this title.

21 C.F.R. Part 210 entitled "Current Good Manufacturing Practice in Manufacturing, Processing, Packing or Holding of Drugs; General" provides, at § 210.1(b):

"The failure to comply with any regulation set forth in this part and in parts 211 through 226 of this Chapter in the manufacture, processing, packing or holding of a drug shall render such drug to be adulterated under section 501(a)(2)(B) of the [FDC] Act and such drug, as well as the person who is responsible for the failure to comply shall be subject to regulatory action."

Similarly, 21 U.S.C. § 351(a)(2)(B) states that:

"A drug or device shall be deemed to be adulterated ... (B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength and meets the quality and purity characteristics which it purports or is represented to possess. . . .

Current Good Manufacturing Practices require, first and foremost, that every drug manufacturer and/or processor develop and follow detailed, written procedures for all aspects of the production, testing, storage, labeling and distribution of any and all of its drug products. *See Generally:* 21 C.F.R. §§ 211.80, 211.100, 211.101, 211.110, 211.113, 211.115, 211.122, 211.125, 211.130, 211.142, 211.150, 211.166. The regulations further specify in clear and unambiguous language what information these written procedures must include and the areas which they must cover as well as the manner in which they are to be followed. The regulations are obviously designed to apply to any person or entity that is engaged in the drug manufacturing, processing, labeling, etc. business. *See, e.g.:* 21 C.F.R. §§ 210.1, 211.1. Regular and continuing training of all employees and personnel in current good manufacturing practices by qualified individuals is also expected. 21 C.F.R. 211.25.

In addition, the CGMP Regulations contemplate that drug producers and manufacturers will conduct stability testing of several batches of each of their products at regular intervals and in accordance with their written programs and that they will make and maintain detailed and accurate written records of all tests run. 21 C.F.R. § 211.166.

Finally, the regulations mandate that any building(s) used in the manufacture, processing, packing or holding of drug products be constructed and maintained in such a way as "to prevent mix-ups between different components, drug product containers, closures, labeling, in-process materials or drug products and to prevent contamination." 21 C.F.R. § 211.42. Adequate ventilation is to be provided and air filtration systems are to be used when appropriate on air supplies to production areas. If air is recirculated to production areas, measures must be taken to control recirculation of dust from production. 21 C.F.R. § 211.46.

■ Evaluating the evidence presented in the case at bar in conjunction with all of the foregoing standards and regulations, this Court can come to no other conclusion but that the entry of a preliminary injunction against the Defendants is proper at this time pending the government's determination that Richlyn Laboratories is in full compliance with current good manufacturing practices. To be sure, the Defendants do not seriously contest FDA's contention that their production, labeling and distribution operations are not in compliance with CGMP regulations nor do they dispute that they have been found to have violated those regulations in

the past. *See, e.g.:* Exhibits D–1, D–3, D–4; N.T. 9/22/92, 87–99; N.T. 9/24/92, 85–88). Rather, the thrust of Richlyn's defense to the government's complaint and motion in this matter has been that they are and, since April, 1992 have been taking steps toward complying with the CGMP Regulations and that several improvements have been made in their validation and stability testing procedures thus far. Defendants further assert that inasmuch as they have already had to lay off approximately one-half of their 60–person workforce as a result of the temporary restraining order, the imposition of a preliminary injunction would work an unnecessarily harsh result upon them and their employees given the steps which they have already taken toward compliance.

While we acknowledge that several improvements have been made at Richlyn Laboratories since the FDA's April, 1992 inspection, we nevertheless cannot ignore Richlyn's history of CGMP violations or its history of promising and attempting to comply with these regulations only upon receipt of FDA Violation Notices or under threat of further legal action by the government. The record clearly indicates that the violations discovered by the FDA's inspection team in April and June of this year are not isolated incidents, nor are product mix-ups such as the one which occurred in August. With more than twenty-five years of experience in the drug manufacturing-processing industry, the Defendants should know what actions must be taken and what procedures must be implemented to satisfy the requirements of the Food, Drug and Cosmetic Act and the Current Good Manufacturing Practice Regulations. Given this evidence, this Court finds it difficult, if not impossible, to believe that the Defendants are sincere when they say that they intend to be in full compliance with the regulations within one year.

In light then, of all of the evidence presented, we find that the Plaintiff has met its burden of demonstrating that the Defendants have and were until the entry of the TRO on September 21, 1992 violating the provisions of the Food, Drug and Cosmetic Act by not adhering to the Current Good Manufacturing Practice Regulations and of showing that there exists a reasonable likelihood of future violations.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter and the parties to this action pursuant to 21 U.S.C. § 332(a) and 28 U.S.C. §§ 1331, 1337 and 1345.

2. The Defendants' drug manufacturing, processing and labeling operations are inadequate and fail to satisfy and comply with the standards established in the Food and Drug Administration's Current Good Manufacturing Practice Regulations (21 C.F.R. § 210.1 *et seq.*) for validation, stability testing and prevention of cross-contamination.

3. The Defendants have introduced adulterated drug products into the stream of interstate commerce in violation of the Food, Drug and Cosmetic Act, 21 U.S.C. § 331.

4. There is a reasonable likelihood that the Defendants will continue to manufacture and place adulterated drug products in interstate commerce and thereby violate the Food, Drug and Cosmetic Act in the future if they are not now preliminarily enjoined from doing so.

5. The continued production and introduction of adulterated drug products into interstate commerce poses a serious threat to the public health, safety and welfare.

6. The issuance of a preliminary injunction at this time enjoining the Defendants from continuing their manufacturing, processing and distribution activities until such time as they are in compliance with Current Good Manufacturing Practices is the only appropriate remedy to safeguard and protect the public's health, safety and welfare.

For all of the above-stated reasons, the attached order is hereby entered.

## ORDER

AND NOW, this 1st day of October, 1992, upon consideration of Plaintiff's Motion for Preliminary Injunction and following careful review and consideration of the evidence presented, it is hereby ORDERED that the Motion is GRANTED and the Defendants, Richlyn Laboratories, Inc., a corporation,

and Richard S. Weinberg, an individual, and each and all of their officers, agents, servants, employees and any and all persons in active concert or participation with them or any of them are hereby preliminarily restrained and enjoined from:

(A) directly or indirectly doing or causing the introduction or delivery for introduction into interstate commerce of any drug whose labeling is false or misleading in any particular;

(B) directly or indirectly doing or causing the introduction or delivery for introduction into interstate commerce of any drug which is manufactured, processed, packed, or labeled at Defendants' facilities in Philadelphia, Pennsylvania; and any drug which is manufactured, processed, packed, or labeled at Defendants' facilities in Philadelphia, Pennsylvania; and

(C) manufacturing, processing, packing, or labeling any drug while held for sale after shipment of one or more of its components in interstate commerce, unless and until all of the following conditions have been met:

(1) The methods used in, and the facilities and controls to be used for manufacturing, processing, packing, labeling, and holding any drug, are established, operated, and administered in compliance with 21 U.S.C. § 351(a)(2)(B) and all Current Good Manufacturing Practice ("CGMP") Regulations for drugs, 21 C.F.R. Parts 210 and 211.

(2) The Defendants select a person subject to the approval of the Food and Drug Administration ("FDA") who, by reason of training and experience, is qualified to make inspections of drug manufacturing facilities to determine that the methods, facilities, and controls are operated and administered in compliance with 21 U.S.C. § 351(a)(2)(B) and 21 C.F.R. Parts 210 and 211, and such person:

(a) inspects the Defendants' manufacturing facilities and manner of operating, and certifies to FDA, in writing that the firm is in compliance with 21 U.S.C. § 351(a)(2)(B) and 21 C.F.R. Parts 210 and 211;

(b) examines all drugs and components manufactured, processed, packed, and

held at the Defendants' plant and reports in writing to FDA on whether such drugs were manufactured, processed, packed in accordance with 21 U.S.C. § 351(a)(2)(B) and 21 C.F.R. Parts 210 and 211.

FDA may require the destruction of any product that either the consultant or FDA determines was manufactured, processed, packed, labeled, or held in violation of 21 U.S.C. § 351(a)(2)(B) or 21 C.F.R. Parts 210 or 211. Such destruction shall be accomplished by the Defendants under FDA supervision, the costs or which shall be born by the Defendants. Alternatively, FDA may, in its discretion, permit the Defendants to attempt to recondition such products under FDA supervision, the costs of which shall be born by the Defendants.